## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN CALFO and JANEZ DEMSAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>JOHN P. MESSINA, SR., MICHAEL J. GOLDE, JAY H. SCHECTER, SCOTT SCHECTER, JOSEPH CASSERA, ROBERT CASSERA, JAMES ALTUCHER, JAMES FOLEY, KAREN AMATO, THOMAS J. CLARKE, JR., LARRY MELBY, and SYLVAN HOLZER,<br><br>Defendants. | **Civil Action No. 15 Civ. 04010 (LGS)**<br><br>**CLASS ACTION**<br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION.................................................................................... 1

JURISDICTION AND VENUE............................................................................... 8

PARTIES AND IMPLICATED ENTITIES............................................................ 8

SUBSTANTIVE ALLEGATIONS ........................................................................ 11

NO SAFE HARBOR............................................................................................... 84

LOSS CAUSATION/ECONOMIC LOSS ............................................................. 84

RELIANCE PRESUMPTION................................................................................ 86

PLAINTIFFS' CLASS ACTION ALLEGATIONS .............................................. 87

COUNT I................................................................................................................. 89

    Violations of Section 10(b) of the Exchange Act
    and Rule 10b-5 Promulgated Thereunder
    Against the Individual Defendants ............................................................. 90

COUNT II................................................................................................................ 93

    Violations of Section 20(a) of the Exchange Act
    Against The Individual Defendants.......................................................... 93

PRAYER FOR RELIEF......................................................................................... 94

DEMAND FOR TRIAL BY JURY ....................................................................... 95

Lead Plaintiffs Stephen Calfo and Janez Demsar ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and based upon information and belief as to all other matters from the investigation conducted by and through Plaintiffs' attorneys. This investigation included, without limitation, a review of the following: Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Corporate Resource Services, Inc. ("Corporate Resource," "CRS," or the "Company"); analysts' reports and advisories about the Company; filings in two cases in the United States Bankruptcy Courts for the Southern District of New York and the District of Delaware; and information readily obtainable from public sources. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of Corporate Resource ("Class") between April 26, 2012 and March 20, 2015 (the "Class Period"), inclusive, seeking to recover compensable damages caused by the Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Corporate Resource was a diversified technology, staffing, recruiting, and consulting services firm. The Company offered trained employees in the areas of insurance,

information technology, accounting, legal, engineering, science, healthcare, life sciences, creative services, hospitality, retail, general business, and light industrial work.

3.     Defendant Robert Cassera ("R. Cassera") has been a Director of Corporate Resource's Board of Directors ("Board") at all relevant times until his resignation on February 4, 2015.   As of November 21, 2014, R. Cassera beneficially owned approximately 79.4% of Corporate Resource's outstanding common stock.  During the Class Period, he even owned up to approximately 90% of the outstanding common stock.

4.     Since 1993, R. Cassera has also been the founder, sole owner, president, and Director of TS Employment, Inc. and its related entities, including, without limitation TSE-PEO, Inc. (the "TSE entities").

5.     On August 27, 2010, Corporate Resource entered into Master Service Agreements ("MSAs") with TS Employment, Inc. and TSE-PEO, Inc.  These agreements provided for the provision of professional employment organization ("PEO") services for Corporate Resource and its subsidiaries.  These TSE entities purportedly provided PEO services to Corporate Resource as part of a co-employment arrangement where TSE was the employer of record and the Company was the worksite employer.  These PEO services included, without limitation, accounting for and paying federal withholding taxes on behalf of both Corporate Resource's internal employees and employees placed at the Company's clients.  The TSE entities charged Corporate Resource an amount equal to the actual wages and associated payroll taxes for employees plus an agreed upon rate for workers' compensation and health insurance, as well as an administrative fee.

6.     Although separate on paper, Corporate Resource and the TSE entities were alter-egos that were the same in all respects but name: R. Cassera owned and controlled both; the senior-most executives from both companies were the same, including several members of R.

Cassera's family; they worked at the same offices; and they used the same information databases. The entities transferred at least tens of millions of dollars between each other, at times likely unlawfully. Moreover, Corporate Resource's common stock was used as currency for the Company to purchase businesses from the TSE entities and pay for lucrative related-party transactions, such as the MSAs and apparent "related-party loans" from TSE. Corporate Resource also used its common stock as currency for a shopping spree of acquiring other companies to meteorically raise the Company's revenue and expand.

7.     The buoy for R. Cassera and the Defendants' expansion of Corporate Resource—and the resulting assets and common stock that could be transferred to the TSE entities through lucrative related-party transactions—was the Company's financing source. Corporate Resource and its subsidiaries were parties to account purchase agreements ("APAs") with Wells Fargo Capital Finance, an operating division of Wells Fargo Bank, N.A. ("Wells Fargo"), which served as the Company's crucial financing facility. R. Cassera had to guarantee this financing.

8.     Corporate Resource, however, was a house of cards that in early February 2015 started blowing over. Then, Corporate Resource surprised investors by conceding through public disclosures that TSE had a material unpaid federal-payroll-tax liability that led to its bankruptcy. This liability has been estimated to be approximately $100 million. It was for tax that was supposed to be paid for both Corporate Resource's internal employees and employees placed at the Company's clients ("material tax-withholding liability"). Apparently, Corporate Resource and TSE could not use Corporate Resource's common stock—its primary currency—to pay the United States Internal Revenue Service ("IRS").

9.     Corporate Resource was forced to restate all of its financial statements disclosed throughout the Class Period. Indeed, since Corporate Resource filed its Form 10-Q with the SEC

on November 14, 2013 for the third quarter ended October 4, 2013 ("3Q2013 10-Q"), the Company has left investors in the dark by failing to disclose reliable financial statements to the investing world.

10.     Corporate Resource's independent auditor, Crowe Horwath LLP ("Crowe"), abruptly resigned.  The Audit Committee of Corporate Resource's Board ("Audit Committee") tried conducting an independent investigation into this cataclysmic fraud; they retained a law firm to help the independent investigation.  But their efforts ended before they began: Wells Fargo cut off the Audit Committee's resources.  The Audit Committee's scathing resignation letters revealed their inability to investigate how this fraud raged unabated, and they noted the malfeasance and obstruction by TSE and R. Cassera.

11.     The material tax-withholding liability jeopardized Corporate Resource's essential funding from Wells Fargo.  Corporate Resource terminated its customer relationships and closed shop.  The Company's senior executives relinquished control to an independent chief restructuring officer.  An exodus of Corporate Resource's senior executives ensued.  Ultimately, the Nasdaq Stock Market, LLC ("NASDAQ") delisted Corporate Resource.

12.     On July 23, 2015, Corporate Resource joined TSE by declaring bankruptcy, principally because of the facts underlying the fraud alleged herein, the material tax-withholding liability, and the loss of Wells Fargo's funding.  The house of cards was decimated.

13.     The material tax-withholding liability, the loss of Wells Fargo's financing, and Corporate Resource's resulting cataclysmic fall was no surprise to the Individual Defendants. They knew about or, at the least, recklessly disregarded the facts underlying this fraud even before the Class Period began.

14.     Information revealed from TSE's bankruptcy proceeding exposed R. Cassera and others' fraudulent use of TSE, the TSE entities, and Corporate Resource's assets, including preliminary findings from the investigations of the bankruptcy trustee and the U.S. Attorney's office for the U.S. District Court for the Southern District of New York.   In particular, the suspicious interconnectedness among and transactions between Corporate Resource, TSE, and the TSE entities has lead the bankruptcy trustee to suspect a "massive fraud" that "may have filled the coffers of numerous Cassera-related companies."   He stated that the "***Cassera businesses … have been operated with little or no regard to corporate separateness.***"[1]   TSE had no separate lease for occupancy, no dedicated computer equipment, and no cost-sharing agreement or similar documents for the allocation of overhead costs among Corporate Resource, TSE, and the TSE entities.  Moreover, the bankruptcy trustee's nascent investigation has already revealed that during 2013 and 2014, tens of millions of dollars appeared to have been unlawfully transferred between R. Cassera's entities.  The U.S. Attorney's investigation revealed consistent findings.  Particularly concerning the material tax-withholding liability, the bankruptcy trustee noted that a "thorough and independent investigation is necessary … to determine why these taxes were not paid by the Debtor—despite the fact that the Debtor is in the business of paying exactly these kinds of taxes—and why the tax deficiencies of $100 million were not discovered by the Debtor in a timely manner."   The bankruptcy trustee stated that the $100 million tax-withholding liability was "***astonishing.***"  Emergency motions were made to preserve information for discovery because of concern for obstruction.

15.     Information revealed from Corporate Resource's bankruptcy proceeding also exposed R. Cassera's and others' fraudulent use of TSE, the TSE entities, and Corporate Resource's assets.  The bankruptcy trustee for TSE's bankruptcy proceeding again described the

---

[1] Emphasis is added to quotations throughout the Amended Complaint, unless otherwise.

nature between Corporate Resource and TSE, stating that they were "joined at the hip."  TSE maintained records on the same servers as Corporate Resource and the TSE entities, intermingling data.  The bankruptcy trustee described that Corporate Resource and TSE "were interdependent such that one company did not operate without the other."  He reiterated that "TSE did not have any of its own employees or its own independent management."  Rather, "TSE was directed by the management and employees of [Corporate Resource] and certain other companies controlled by Robert Cassera, including Tri-State, to run its everyday operations." Adding some new color to the interconnectedness of these entities, the bankruptcy trustee stated that his investigation revealed "that employees would perform similar or related job functions for [Corporate Resource], [TSE entities], and TSE simultaneously without any clear separation."  In addition, he discovered that "management would perform work for CRS [TSE entities] and TSE. For example, Robert Cassera, John Messina, James Foley, Yolanda Cassera-Trippiedi and a small cadre of relatives of Mr. Cassera have been officers, directors, or otherwise have held positions of authority at [Corporate Resource] and TSE since TSE began operations."  The bankruptcy trustee stated that "[i]t is no secret that, also due to their inseparable relationship, a subject of the Trustee's investigation has been what, if any, role [Corporate Resource] and [TSE entities] had in the disappearance of the $100 million."

16.    The SEC immediately filed its "Joinder of U.S. Securities and Exchange Commission to Motion by Chapter 11 Trustee for Order Transferring Venue of Chapter 11 Case of Corporate Resource Services, Inc. and Its Affiliated Entities from the United States Bankruptcy Court for the District of Delaware to this District," noting the investigation and the bankruptcy trustee's assertion that the Company's filing in Delaware was a ruse to thwart the bankruptcy trustee's investigation in New York.

17.     Several confidential former employees ("FE") have also confirmed that the individual defendants knew about or, at the least, recklessly disregarded the facts underlying the fraud.  Notably, and without limitation, Corporate Resource retained Crowe in late-2013 to audit its financial statements.  When Crowe learned about the material tax-withholding liability in auditing TSE's financial statements, Crowe then raised this issue with Corporate Resource's senior-most executives, who decided not to disclose the liability.  The FEs even said that some of the Individual Defendants specifically knew about the material tax-withholding liability.  The FEs explained that this approaching train wreck was well known throughout and even before the Class Period.

18.     Throughout the Class Period, Corporate Resource's public statements were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars

between the companies; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

19.     The missing $100 million and the resulting events alleged herein have rendered worthless Corporate Resource's common stock.  As a direct cause of Defendants' "massive fraud," the Class members have lost the entirety of their holdings.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j (b) and 78t (a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

22.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein, and the subsequent damages, occurred in this Judicial District.  Moreover, Corporate Resource maintains an office and conducts business in this Judicial District.

23.     In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES AND IMPLICATED ENTITIES

24.     Lead Plaintiff Stephen Calfo ("Calfo"), as set forth as an exhibit (Dkt. # 22, Ex. C) in support of Calfo's motion for appointment as lead plaintiff and approval of counsel, incorporated by reference herein, purchased Corporate Resource common stock at artificially

inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Lead Plaintiff Janez Demsar ("Demsar"), as set forth as an exhibit (Dkt. # 22, Ex. C) in support of Demsar's motion for appointment as lead plaintiff and approval of counsel, incorporated by reference herein, purchased Corporate Resource common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26.     Nonparty Corporate Resource, a Delaware corporation, is headquartered at 160 Broadway, New York, NY 10038.  The Company provided diversified technology, staffing, recruiting, and consulting services in the United States.  During the Class Period, Corporate Resource's stock was traded on the NASDAQ under the symbol "CRRS."  Although originally named a defendant, Corporate Resource petitioned for Chapter 11 bankruptcy on July 23, 2015; the case is *In re Corporate Resource Services Inc.*, 15-BK-11546, in the United States Bankruptcy Court for the District of Delaware.

27.     Nonparty TS Employment, Inc. ("TSE"), a Florida privately held corporation, is headquartered at 160 Broadway, New York, NY 10038.  TSE itself and through its related entities, including, without limitation, TSE-PEO, Inc. ("TSE-PEO"), primarily offered PEO-related services to privately held and public companies and other PEOs.  TSE, TSE-PEO, and their related entities ("TSE entities" or "Tri-State") provided PEO services to Corporate Resource.  In this role, the TSE entities processed all payroll and revenue billing for Corporate Resource.  TSE petitioned for Chapter 11 bankruptcy on February 2, 2015; the case is *In re TS Employment Inc.*, 15-BK-10243, in the United States Bankruptcy Court for the Southern District of New York.

28.     Defendant John P. Messina, Sr. ("Messina") has been Corporate Resource's chairman and chief executive officer ("CEO") during the Class Period.  He has served as Corporate Resource's President since March 2009 through July 22, 2014.  Moreover, Messina has served as executive vice president of TSE since January 1998.

29.     Defendant Jay H. Schecter ("J. Schecter") has been Corporate Resource's CEO during the Class Period until his resignation on October 8, 2012.

30.     Defendant Michael J. Golde ("Golde") has been Corporate Resource's chief financial officer ("CFO") during the Class Period until his resignation on January 12, 2015.  He was replaced by Joseph P. Ciavarella, who also resigned on February 20, 2015.

31.     Defendant Scott Schecter ("S. Schecter") has been Corporate Resource's CFO during the Class Period until his termination on May 17, 2012.

32.     Defendant Joseph Cassera ("J. Cassera") has been a Director of Corporate Resource's Board at all relevant times and has served as vice president of operations of TSE since January 2001. J. Cassera is Defendant Robert Cassera's brother.

33.     Defendant R. Cassera has been a Director of Corporate Resource's Board at all relevant times until his resignation on February 4, 2015.  As of November 21, 2014, R. Cassera beneficially owned approximately 79.4% of the outstanding common stock of Corporate Resource.  This amount approached approximately 90% during the Class Period.  Moreover, R. Cassera is the founder, sole owner, president, and Director of TSE since 1993.  R. Cassera has interests in and controls the TSE entities.  He is J. Cassera's brother.

34.     Defendant James Altucher ("Altucher") has been a Director of Corporate Resource's Board at all relevant times until his resignation on February 10, 2015.

35.     Defendant James Foley ("Foley") has been a Director of Corporate Resource's Board at all relevant times, and Foley has been TSE's chief operating officer ("COO") since 1997 and CFO from 1997 to 2004.

36.     Defendant Karen Amato ("Amato") has been a Director of Corporate Resource's Board and the Chairman of the Company's Audit Committee at all relevant times until her resignation on September 28, 2014.

37.     Defendant Thomas J. Clarke, Jr. ("Clarke") has been a Director of Corporate Resource's Board and a member of the Audit Committee at all relevant times until his resignation on February 5, 2015.

38.     Defendant Larry Melby ("Melby") has been a Director of Corporate Resource's Board and a member of the Audit Committee at all relevant times until his resignation on February 5, 2015.

39.     Defendant Sylvan Holzer ("Holzer") has been a Director of Corporate Resource's Board and the Chair of the Audit Committee from September 29, 2014 until his resignation on February 5, 2015.  Holzer served as the Audit Committee's financial expert, as defined under SEC rules.

40.     Defendants Messina, Golde, J. Schecter, S. Schecter, J. Cassera, R. Cassera, Altucher, Foley, Amato, Clarke, Melby, and Holzer are collectively referred to hereinafter as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

41.     On February 23, 2010, Accountabilities, Inc. ("Accountabilities"), a Delaware corporation, completed a holding-company reorganization and became a wholly owned subsidiary of the then-new public company, Corporate Resource.  The TSE entities and R.

Cassera owned approximately 66.2% of Accountabilities' common stock prior to this reorganization and the same percentage of Corporate Resource's common stock following this reorganization.

42.     Corporate Resource was a diversified technology, staffing, recruiting, and consulting services firm.  The Company also provided cloud-based enterprise applications and hosting services to PEOs and staffing companies.  It offered trained employees in the areas of insurance, information technology, accounting, legal, engineering, science, healthcare, life sciences, creative services, hospitality, retail, general business, and light industrial work. According to Corporate Resource, its blended staffing solutions were tailored to customers' needs and included customized employee pre-training and testing, on-site facilities management, vendor management, risk assessment and management, market analyses, and productivity/occupational engineering studies.  According to Corporate Resource, its ability to deliver broad-based solutions provided its customers a "one stop shop" to fulfill their staffing needs, from professional services and consulting to clerical and light-industrial positions.

43.     As of June 2013, Corporate Resource had over 39,000 employees on assignment at peak periods, 6,000 active customers, 120,000 staff annually, and 815 staffing professionals working throughout the U.S.  As of October 31, 2014, Corporate Resource operated in approximately 250 staffing and on-site facilities throughout the U.S. and in the United Kingdom. The Company offered services to a wide variety of clients in many industries, ranging from sole proprietorships to Fortune 1000 companies.

44.     Since 2010, Corporate Resource has experienced meteoric growth.  In a June 2013 investor presentation, the Company stated that it had completed "six major acquisitions of regional staffing agencies in the last four years."  Corporate Resource revealed the following

statistics about its blistering growth as of June 2013: "CRS' annual growth from 2007-2012 was 78%"; "By way of comparison, average annual growth across the industry for the same time period was -1.7%"; "The industry is projected to grow at an average annual rate of 2.7% 2012 to 2017"; "CRS is projected to have Y-O-Y growth of 20-25% from 2012 to 2013"; "CRS revenues are anticipated to rise both in the near and intermediate term"; "2012 revenue reached $640 million with 85% growth"; and "CRS has incurred net losses in two of its last three fiscal years, but has reported a net profit in each of its last three fiscal quarters and is expecting to generate net profit margins of 1.0% to 1.2% for 2013 and continue to improve those profit margins in 2014."

45.     Throughout the Class Period, R. Cassera and the TSE entities owned at least approximately 80% of Corporate Resource's common stock.  During the Class Period, this ownership exceeded approximately 90%.  This overwhelming majority control rendered Corporate Resource a "controlled company" within the meaning of NASDAQ corporate-governance standards.  R. Cassera effectively controlled Corporate Resource and its Board.  His overwhelming majority ownership of the Company enabled him to elect all of the Board members, appoint new management, approve actions requiring shareholder approval, engage in related-party transactions, and sell or dispose of assets.

46.     R. Cassera also controlled the TSE entities, including, without limitation, now-bankrupt TS Employment, Inc. (TSE) and TSE-PEO, Inc. (TSE-PEO), both of which provided PEO services to Corporate Resource.  The TSE entities in essence were PEOs.  Employers outsourced to PEOs employee-management tasks, including employee benefits, payroll and workers' compensation, recruiting, risk/safety management, training and development, and employee-withholding-tax accounting and payment to the IRS.  Other TSE entities included the

following: Carusso Staffing Corp.; Tri-State Entertainment Production PEO, Inc.; Justin & Brooks, Inc.; Tri-State CRM, Inc.; Tri-State Staffing, Inc.; Tri-State Solutions, Inc.; Todays PEO Inc.; TSEFL, Inc.; Tri-Overload Staffing Inc.; D & D Staffing of New York, Corp.; Tri-Odyssey PEO Inc.; TS Staffing Services, Inc.; Solutions H2 Corp.; Tri-State Employment Service Inc.; TS Staffing Corp.; Tri-State Personet Corp.; Tri-Diamond Staffing Inc.; A Temporary Staffing Inc.; and STS Group, Inc.

47.     R. Cassera, Corporate Resource, and the TSE entities were intertwined. Corporate Resource filed a Form 10-K for the fiscal year ended January 3, 2014 with the SEC (the "2013 10-K").  According to the 2013 10-K, "[t]ransactions between [Corporate Resource] and [the TSE entities] include [R. Cassera's] guarantee of our subsidiaries' obligations under the Facility with Wells Fargo, the provision of professional employer services to our subsidiaries, and, in the past, the exchange of our indebtedness for shares of our common stock. . . ." Corporate Resource acknowledged that its interests, together with those of its shareholders, might conflict with those of R. Cassera and the TSE entities.

48.     Corporate Resource also acknowledged in the 2013 10-K that "certain employees of [the TSE entities] hold management positions in our company, including John Messina, our President, Chief Executive Officer and Chairman of the Board."  The Company stated that "[w]hile we do not have any written policies or procedures in place that address potential conflicts of interest arising from Mr. Messina's employment with TSE and his management responsibilities with us, we intend to present any potential conflicts that may arise in the future to our Audit Committee for their review."

49.     Corporate Resource itself does not provide PEO services.  Instead, Corporate Resource "entered into a Master Service Agreement with [TSE and TSE-PEO] on August 27,

2010.  These agreements provide for the provision of professional employer services for the Company and its subsidiaries."[2]  Pursuant to these MSAs, Corporate Resource outsourced to TSE and TSE-PEO the Company's payroll, tax, and workers' compensation insurance services. As the Company stated in its 2013 10-K, it outsourced these PEO services to the TSE entities purportedly "to reduce certain insurance risks and costs."  The Company called this relationship "a co-employment arrangement where [the TSE entities are] the employer of record and we are the worksite employer."  Pursuant to that arrangement, the TSE entities provides "payroll services, administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services."

50.    The TSE entities charged Corporate Resource "the wages and associated payroll taxes for the employee plus an agreed upon rate for workers' compensation and health insurance as well as an administrative fee."  Corporate Resource claimed that it received favorable rates for the services that it received from the TSE entities.  In 2013, the TSE entities charged the Company $712.2 million, up over $121 million from $596.2 million in 2012.  According to the 2013 10-K, "[due] to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $9.4 million and $9.6 million as of January 3, 2014 and December 28, 2012, respectively."

51.    According to the Company, it classified amounts owed to the TSE entities as "related party loans payable."  In the 2013 10-K, with respect to the related-party loan payable, Corporate Resources stated that "[t]he principal amount increases or decreases based on periodic

---

[2] While the text of the 2013 10-K indicates one MSA, the Exhibits thereto list two: a "Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TSE-PEO, Inc." and a "Master Services Agreement (PEO Services) dated August 27, 2010 by and between Corporate Resource Services, Inc. and TS Employment, Inc."

borrowings or repayments, and each subsidiary of the Company is charged interest at the rate of 12% per annum of their net loan payable. The related party loans payable are due on demand."

52.    R. Cassera was also integral to Corporate Resource's main funding source. Corporate Resource and its subsidiaries secured funding through APAs with Wells Fargo.  Under the APAs, a maximum amount of $80 million of accounts receivable could have been financed through Wells Fargo (the "Facility").  It allowed for up to 90% of qualifying receivables to be funded.  The Facility was personally guaranteed by R. Cassera.  In the event that R. Cassera ceased to guarantee the Facility, the Facility could have been closed.

53.    On June 20, 2014, Wells Fargo required TSE not to demand payment from Corporate Resource of an outstanding balance on related-party loans payable of at least $15 million for a period of at least one year.

54.    On December 9, 2014, Corporate Resource filed a Form 8-K with the SEC ("12/9/14 Form 8-K"), disclosing amendments to the APAs between Corporate Resource and its subsidiaries and Wells Fargo.   Under the APAs, Corporate Resource and its subsidiaries generally were bound to pay $500,000 per month to Wells Fargo as monitoring fees.  Corporate Resource and its subsidiaries were bound to provide Wells Fargo with weekly cash-flow forecasts.  Also, Corporate Resource and its subsidiaries were bound to cause TSE to deliver the following to Wells Fargo as stated in Exhibit 10.8, Amendment to Account Purchase Agreement, filed with the 12/9/14 Form 8-K: "(a) monthly updated insurance certificates evidencing, and proof of payment for, workers compensation insurance for TSE and Customer, (b) from time to time at the request of [Wells Fargo], an Internal Revenue Service form 8821 from and executed by TSE and each other Person that remits payroll taxes on behalf of Customer or TSE, or in respect of payroll or wages related to the staffing services provided by Customer and (c) on a

weekly basis, a report of all payroll and payroll tax payments by TSE and such Person(s), together with evidence, reasonably satisfactory to [Wells Fargo], of the same. Without limiting the foregoing, Customer will cooperate to provide information on TSE, upon WFBC's request from time to time."

## The Fraudulent Scheme

55.     On February 2, 2015, TSE filed for bankruptcy. A primary factor for TSE's bankruptcy was a material unpaid federal-payroll-tax liability owed to the IRS. This material unpaid federal-payroll-tax liability, which although disputed, was estimated to be approximately $100 million, was owed for federal payroll tax that should have been withheld from paychecks of both Corporate Resource's internal employees and employees placed at the Company's clients ("material tax-withholding liability").

56.     The material tax-withholding liability triggered Corporate Resource's filing of a Form 8-K on February 3, 2015 with the SEC ("2/3/15 Form 8-K"). In addition to disclosing the material tax-withholding liability, the Company disclosed that on January 15, 2015, it reported to Wells Fargo that as of November 30, 2014, the Company violated the tangible net worth covenants, along with the financial-reporting requirements, under the APAs. These violations were events of defaults under the APAs.

57.     Corporate Resource also disclosed in the 2/3/13 Form 8-K that on January 28, 2015, Wells Fargo informed Corporate Resource that based on concerns about the material tax-withholding liability and the Company's failures to comply with the APAs, Wells Fargo would reconsider funding the Company's operations.

58.     Corporate Resource's Audit Committee as of February 3, 2013 was tasked to investigate why the material tax-withholding liability amassed.  The Audit Committee retained a law firm to help in the purportedly independent investigation.

59.     Soon thereafter on February 6, 2013, Corporate Resource disclosed in its Form 8-K filed with the SEC ("2/6/15 Form 8-K") that the material tax-withholding liability resulted in the Company having to restate its financial statements for the year ended January 3, 2014 and the quarters ended April 4, 2014, July 4, 2014, and October 3, 2014.  The Company disclosed in the 2/6/15 Form 8-K that "after discussions with management and members of the Audit Committee of the Company, Crowe Horwath delivered a letter stating that disclosure should be made or action taken to prevent future reliance on their audit report dated June 30, 2014 related to the Company's January 3, 2014 financial statements filed on Form 10-K, and their completed interim reviews on the April 4, 2014, July 4, 2014, and October 3, 2014 financial statements filed in their respective Form 10-Qs, due to the impact of material uncertainties related to payroll tax matters on those previously issued financial statements."

60.     Corporate Resource did not provide any more specificity to the investing world about how exactly the material tax-withholding liability rendered unreliable the Company's financial statements throughout the Class Period; instead, the Company deemed them wholly unreliable.  Indeed, since Corporate Resource filed its 3Q2013 10-Q with the SEC on November 14, 2013, the Company has left the investors in the dark by failing to disclose reliable financial statements to the investing world.

61.     In reaction to the material tax-withholding liability, Corporate Resource disclosed in its Form 8-K filed with the SEC on February 10, 2015 that the Company agreed with Wells Fargo to retain Robert Riiska ("Riiska") of Focus Management Group USA, Inc. ("Focus") as

the Company's then-chief restructuring officer ("CRO").   Corporate Resource gave Riiska the sole power to approve all payments and fund transfers and supervise the sale, liquidation, or transition of the Company's assets and customer contracts.   Corporate Resource further agreed to deliver to Wells Fargo a forecast of daily cash receipts.

62.   Days after Corporate Resource's initial revelation of the material tax-withholding liability, the Company in its Form 8-K filed with the SEC on February 10, 2015 ("2/10/15 Form 8-K") disclosed the abrupt resignations of Clarke, Holzer, and Melby—the Audit Committee members—effective February 5, 2015.   In each of their resignation letters, Clarke, Holzer, and Melby expressed concerns about the circumstances surrounding the material tax-withholding liability, its effect on Corporate Resource, its effect on financing from Wells Fargo, and their inability to conduct an independent investigation of these issues.   Particularly noteworthy was each of Clarke, Holzer, and Melby expressing concern about the malfeasance associated with these issues, the relationship between Corporate Resource and TSE, Corporate Resource's obstruction of their efforts, and their inability to protect the minority shareholders' rights.   Their letters stated, in pertinent part, as follows:

> Notwithstanding the Audit Committee's immediate mobilization, only today we were advised by Wells Fargo, which has sole control of the Company's financing, that it expressly and unequivocally refuses to provide any funding for the Audit Committee's investigation or to allow any Company funds at all to be used for an investigation. Further, management has advised the Audit Committee that there is no other funding whatsoever available for such investigation. *This leaves the Audit Committee paralyzed from taking action, in direct contravention of the well establish legal and policy imperatives applicable to it, including under The Dodd Frank Act, its fiduciary duties to stockholders, and other standards that demand audit committees be assured access to proper advisors and financing to execute their responsibilities.*
>
> *The foregoing concerns are exacerbated not only by the apparent malfeasance that requires immediate remediation for the benefit of our stockholders, but also by the obvious related party relationships between TSE and the Company.* We believe the circumstances clearly call for complete independence in immediate investigations. *We are additionally concerned that the Company's*

*inexplicable delay in issuing and enforcing a document hold may jeopardize any investigation and invoke the possibility of criminal liability if relevant documents are destroyed.*

*Nonetheless, all of the members of the Audit Committee have been effectively obstructed by the positions of the Company and Wells Fargo.* Accordingly and regrettably, I hereby resign my position as a member of the Board of Directors and all committees thereof of Corporate Resource Services effective immediately. I note that this action is only taken after the members of the Audit Committee have exhausted our efforts to overcome the obstacles to conducting an independent investigation and executing our duties to the Company's stockholders.

63. Also on February 10, 2105, Corporate Resource disclosed that Crowe resigned effective February 9, 2015, and that the Company was thus unlikely to file its annual report on Form 10-K in a timely manner.

64. On February 26, 2015, Corporate Resource filed a Form 8-K with the SEC, disclosing that the Company was terminating services for approximately 800 customers, representing approximately $400 million of gross revenue for the year ended January 2, 2015. In connection with these terminations, Corporate Resource was closing offices and eliminating associated selling, general, and administrative expenses.

65. On March 3, 2015, Corporate Resource filed a Form 8-K with the SEC ("3/3/15 Form 8-K"), disclosing that the Company sold a meaningful portion of its assets and business, terminated several meaningful customer relationships, closed offices, and eliminated related selling, general, and administrative expenses.

66. On March 12, 2015, Corporate Resource filed a Form 8-K with the SEC ("3/12/15 Form 8-K"), disclosing that the Company substantially sold or transferred all of its then-remaining customer relationships, resulting in its ongoing revenues being minimal—if any. In connection with this cessation of operations, Corporate Resource was closing its remaining production offices and eliminating the related selling, general, and administrative expenses.

67.     On March 20, 2015, Corporate Resource disclosed that the NASDAQ decided to remove from listing Corporate Resource common stock, effective at the opening of trading on March 30, 2015.  NASDAQ determined that Corporate Resource no longer qualified for listing under Listing Rules 5101 and IM-5101-1.  Corporate Resource was notified of NASDAQ's determination on February 23, 2015, and the Company did not appeal this determination, rendering the determination final on March 4, 2015.

68.     On April 1, 2015, Corporate Resource filed a Form 12b-25 notification of late filing with the SEC ("4/1/15 Form 12b-25").  Corporate Resource disclosed that it was unable to estimate when—if at all—it would file its annual report for the year ended January 2, 2015 or any future report.  The reasons included, without limitation, the material tax-withholding liability, Crowe's resignation, Corporate Resource's financial-statement restatements, and the Company's termination of operations.

69.     Ultimately, Corporate Resource petitioned for Chapter 11 bankruptcy on July 23, 2015.  The decision stemmed from TSE's failure to pay an alleged $80 million balance in withholding taxes.[3]  J. Scott Victor ("Victor"), the then-CRO, stated that absent "the protections of the Bankruptcy Code, a shutdown of the debtors' operations is inevitable, to the detriment of the debtors' employees, customers, suppliers and creditors."  Corporate Resource's troubles began in late January, when it learned that TSE, the PEO that the Company utilized, "had failed to remit a very substantial amount to taxing authorities, mostly related to employee withholding taxes, in an amount then believed to be in the range of $80 million," Victor said.

---

[3] Jamie Santo, *Staffing Firm CRS Hits Ch. 11 in Wake of Tax Issue*, LAW360, July 24, 2015.

**The Individual Defendants Were Aware of or, at the Least, Recklessly Disregarded the Fraud Throughout the Class Period**

*TSE's Bankruptcy Proceeding Calls the $100 Million Tax Shortfall a "Massive Fraud"*

70.     Information revealed from TS Employment, Inc.'s (TSE) bankruptcy proceeding exposed R. Cassera and others' fraudulent use of TSE, the TSE entities, and Corporate Resource's assets, including preliminary findings from the investigations of the bankruptcy trustee and the U.S. Attorney's office for the U.S. District Court for the Southern District of New York.   Notably, and without limitation, the suspicious interconnectedness among and transactions between Corporate Resource, TSE, and the TSE entities has lead the bankruptcy trustee to suspect a "massive fraud" that "may have filled the coffers of numerous Cassera-related companies."  He stated that the "***Cassera businesses*** … ***have been operated with little or no regard to corporate separateness.***"  TSE had no separate lease for occupancy, no dedicated computer equipment, and no cost-sharing agreement or similar documents for the allocation of overhead costs among Corporate Resource, TSE, and the TSE entities.   Moreover, the bankruptcy trustee's nascent investigation has already revealed that during 2013 and 2014, tens of millions of dollars appeared to have been unlawfully transferred between R. Cassera's entities. The U.S. Attorney's investigation revealed consistent findings.   Particularly concerning the material tax-withholding liability, the bankruptcy trustee noted that a "thorough and independent investigation is necessary … to determine why these taxes were not paid by the Debtor—despite the fact that the Debtor is in the business of paying exactly these kinds of taxes—and why the tax deficiencies of $100 million were not discovered by the Debtor in a timely manner."   The bankruptcy trustee stated that the $100 million tax-withholding liability was "***astonishing***."

71.    TSE provided payroll services to its one and only client, Corporate Resource.  It operated from 160 Broadway, 15th Floor, New York, New York 10038, the same address as Corporate Resource, two floors above.

72.    The wholesale contradictions and inaccuracies relating to TSE begin with who its employees were.  Although R. Cassera served as TSE's sole shareholder and President, he claimed that both he and the other officers took "no payroll" from TSE.  In paragraph 13 of the Declaration of Robert Cassera Pursuant to Local Rule 1007-2, filed with the Bankruptcy Court on February 2, 2015 ("R. Cassera Declaration"), R. Cassera stated, "I am the Debtor's [TSE] president.  I receive no payroll from the Debtor.  None of the ***other officers*** of the Debtor receive payroll."  However, in paragraph 3 of the Declaration of Robert Cassera in Support of Debtor's Motion for an Order Authorizing Payment of (I) Pre-Petition Wages and Salaries and Other Compensation and Benefits; and (II) Granting Related Relief, also filed with the Bankruptcy Court on February 2, 2015, R. Cassera stated, "I am the only officer of the Debtor and I do not draw a salary from the Debtor. . . ."  In its January 9, 2015 Florida Annual Report, TSE listed as its only officers R. Cassera and his relative, Yolanda Cassera-Trippiedi, TSE's secretary.  By board of directors resolution dated January 30, 2015, TSE resolved to file for protection from creditors under Chapter 11 of the United States Bankruptcy Code and to retain the law firm of Tarter, Krinsky & Drogin, LLP ("Tarter Firm").  This document is at odds with R. Cassera's statement that he is the only officer of TSE, as the Resolution, itself, designates as "authorized persons" the "Chairman of the Board, the Chief Executive Officer ***and*** the Chief Financial Officer."  In neither of his declarations did R. Cassera refer to himself as Chairman, Chief Executive Officer, or Chief Financial Officers, instead referring to himself only as "sole owner and president."

73.     On February 2, 2015, TSE filed its voluntary Chapter 11 petition, including with it the R. Cassera Declaration.  R. Cassera stated in the R. Cassera Declaration that TSE processes payroll for up to thirty thousand employees who "perform services for and on behalf of CRS and its staffing customers."  According to R. Cassera, TSE "recently . . . discovered" its failure to deposit as much as $100 million in payroll taxes to the IRS.  R. Cassera stated that TSE sought protection from creditors to "stabiliz[e its] business operations, so that its becoming aware of this potential significant tax liability does not jeopardize its ability to perform its PEO services to CRS."  R. Cassera also stated that, in consultation with Corporate Resource and Wells Fargo, it retained Barry Kasoff ("Kasoff") as its CRO, subject to the Bankruptcy Courts' approval.

74.     According to R. Cassera, in response to Corporate Resource's purported "demand," TSE's "directors" intended to provide Corporate Resource with "a detailed accounting of all amounts paid by CRS to the Debtor for payroll obligations and of all amounts paid by the Debtor to satisfy those payroll obligations, to ensure CRS, its lender, and its customers that the PEO services provided by the Debtor will continue uninterrupted in the ordinary course of business."

75.     On February 20, 2015, pursuant to Section 1104(a) of the Bankruptcy Code, the United States Trustee ("U.S. Trustee") filed a motion for the appointment of a Chapter 11 Trustee.  In his motion, the U.S. Trustee noted that no dispute existed about TSE's amassing up to $100 million in liabilities to federal and state taxing authorities.  He also noted that TSE's failure was not "an isolated incident."  Rather, TSE management failed over multiple quarters to remit payroll taxes, something the U.S. Trustee could not attribute to negligence, given that paying payroll taxes was its business.  "At present," the U.S. Trustee wrote, "it is not known why the Debtor failed to discover these tax liabilities in a timely fashion, or why the failure to make

the payroll taxes occurred more than once, particularly given the magnitude of the taxes which were not paid. Furthermore, it is unknown if any employees or insiders of the Debtor were responsible for these failures." For the U.S. Trustee, however, because TSE was solely engaged in payroll processing, its failure to pay nearly $100 million in payroll taxes was "*astonishing*," the recurrence over several quarters the product of, "*at a minimum, incompetence and gross mismanagement on the part of [TSE]'s current management.*"

76.     Moreover, the U.S. Trustee called TSE's appointment of Kasoff an "apparent attempt to forestall the appointment of a trustee." In neither his consulting agreement nor an amendment thereto did TSE authorize Kasoff to pursue claims against nor investigate its management and its affiliates—Corporate Resource or the TSE entities. "Nor," according to the U.S. Trustee, "can management be expected to voluntarily initiate actions against themselves to their detriment." According to the U.S. Trustee, under Section 6672(a) of the Internal Revenue Code, 26 U.S.C. § 6672(a), R. Cassera may be liable for the entirety of TSE's $100 million tax liability for his willful failure to collect, truthfully account for, and pay over that amount to the IRS.

77.     The U.S. Trustee continued that good causes existed for the appointment of a Chapter 11 trustee because TSE's creditors were entitled to "an independent, conflict-free party developing a reorganization or liquidation strategy for [TSE], free from any constraints and threat of the management and its oversight of [TSE]." "A thorough and independent investigation is necessary," the U.S. Trustee concluded, "to determine why these taxes were not paid by the Debtor—despite the fact that the Debtor is in the business of paying exactly these kinds of taxes—and why the tax deficiencies of $100 million were not discovered by the Debtor in a timely manner." Given that he was beholden to and subject to the whim of a clearly

interested TSE management, Kasoff could not serve the creditors in any meaningful sense. In other words, according to the U.S. Trustees, creditors—in particular, federal and state taxing authorities—had no reason to trust R. Cassera or the *de facto* trustee/CRO whom he attempted to foist upon them.

78.     On February 19, 2015, the Bankruptcy Court held a pre-motion hearing where TSE consented to the relief that the U.S. Trustee sought.  On February 20, 2015, the Bankruptcy Court entered an order granting the relief and authorizing the appointment of a Chapter 11 Trustee.  On February 27, 2015, the United States Trustee appointed James S. Feltman as the Chapter 11 Trustee ("Feltman" or "Chapter 11 Trustee").

79.     The suspicious interconnectedness among and transactions between CRS, TSE, and the TSE entities has lead the Chapter 11 Trustee to suspect "a massive fraud."

80.     Mindful of the interconnectedness of Corporate Resource, TSE, and the TSE Entities, on March 26, 2015, the Chapter 11 Trustee moved the Bankruptcy Court, *ex parte*, for an Order to ensure preservation of documents and to allow him immediate access to the computers and servers.  The U.S. Trustee labeled his application urgent, the reason simple. "Most importantly," the Trustee concluded, "while the Trustee's investigation is in the beginning stages, there appears to have been a ***massive fraud involving the Debtor***. . . .  Under the circumstances, the Trustee cannot rely upon voluntary cooperation thereby making the instant relief is necessary and appropriate."  According to the Chapter Trustee, information he needed to administer TSE's estate—that TSE, Corporate Resource, and others maintained together—was in danger of spoliation.  The Trustee wrote that Corporate Resource was in the process of winding down its operations, which meant the end of TSE.  Once no business purpose existed for maintaining records, they were in jeopardy of loss.

81.     In his urgent preservation motion, the Chapter 11 Trustee conveyed disturbing findings concerning the interplay among Corporate Resource, TSE, and the TSE entities.  "***The Cassera businesses***," the Trustee stated, "***have been operated with little or no regard to corporate separateness.***"  No contract existed between TSE and the TSE entities, but that did not prevent TSE from sending $1.7 billion of TSE funds to the TSE entities' bank accounts "without any apparent corporate purpose."  According to the Trustee's investigation, TSE has no separate lease for occupancy, no dedicated computer equipment, and no cost-sharing agreement or similar documents for the allocation of overhead costs among Corporate Resource, TSE, and the TSE entities.  Moreover, the Trustee relied on R. Cassera's ownership of nearly 90% of Corporate Resource common stock and full ownership and effective control of the TSE entities.

82.     "Worse yet," the Chapter 11 Trustee continued, "at least some of the TSE entities have engaged in suspicious or lopsided business transactions with the Debtor [TS Employment, Inc. (TSE)], which has hindered the Debtor's ability to pay its creditors, such that they may have a motive to remove or delete Debtor records in order to impede the Trustee's investigation."  According to the Chapter 11 Trustee's nascent investigation, "during 2013 and 2014, the Debtor appears to have paid [the TSE entities] $84 million more than it received."  "During the same period," the Chapter 11 Trustee continued, "the Debtor apparently made more than $30 million in unexplained payments to a related company named 'Broadway PEO' for no discernable reason."  Once again, the Chapter 11 Trustee concluded that "there appears to have been a massive fraud involving the Debtor that may have filled the coffers of numerous Cassera-related companies."

83.     On March 30, 2015, the Bankruptcy Court held a hearing on the Chapter 11 Trustee's preservation motion at which the United States Attorney for the Southern District of

New York ("U.S. Attorney") appeared on behalf of the IRS. On that office's behalf, Arastu K. Chaudhury, Esq. ("Assistant U.S. Attorney") reiterated for the Bankruptcy Court that "the ultimate question is, where did the money go? . . . And it doesn't feel like we're much closer to getting an answer at this point. But what we have learned is that there are a lot of entities, and we're beginning to get concerned that if assets do exist, they are moving from entity to entity to entity." The Assistant U.S. Attorney continued, making an oral application for an order requiring "that the affiliate entities—not CRS, because I think there are additional problems associated with it being a public company—but the private affiliate entities under the control of Mr. Cassera oughtn't to be permitted to engage in any transactions outside of the ordinary course of their business."

84.     On April 6, 2015, the Assistant U.S. Attorney, on behalf of the IRS, filed an "*Ex Parte* Application Pursuant To Fed. R. Bankr. P. 2004 Authorizing the Issuance Of Subpoenas For The Production Of Documents And Deposition Testimony." In its motion, the Assistant U.S. Attorney sought a Bankruptcy Court order allowing "wide ranging discovery to evaluate where the missing assets may be in order to facilitate their return to the Debtor's estate, and how the Debtor's interaction with CRS and the [TSE entities] may have resulted in a $100 million of unpaid tax liability to the United States." The motion described "the massive web of non-debtor entities related in ownership and control to Debtor that exist and are still outside the control of the Trustee. . . ." The Assistant U.S. Attorney asserted that "it is essential to be able to conduct document discovery and examinations of these entities, and their current and former employees, principals, officers, agents, or owners, and any entities that they do business with, to determine where Debtor's missing assets are and, if possible, prevent their dissipation."

85.     On April 16, 2015, the Chapter 11 Trustee filed its own "*Ex Parte* Application for an Order Authorizing the Issuance of Subpoenas for the Production of Documents and Deposition Testimony Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure." He reiterated and reinforced that TSE "is part of a large network of affiliates linked by common ownership and control."  At that time, the Chapter 11 Trustee had identified no fewer than 47 Cassera-related and controlled entities.   "While the true scope and nature of these affiliate relationships is still not entirely clear, the Trustee believes that understanding the web of Debtor affiliates is a key initial step and may establish a basis for claims that the Debtor's estate may have against various third parties relating to, among other things, lopsided business transactions and a $100 million tax shortfall."  Echoing the Assistant U.S. Attorney, the Chapter 11 Trustee stated that the "the central question in this case has been clear from day one: where did that $100 million go?"

86.     Again, noting the interconnectedness of Corporate Resource, TSE, and the TSE entities, "including: (i) Tri-State's provision of professional employer services to CRS subsidiaries; (ii) CRS' acquisition of certain Tri-State entities; and (iii) the exchange of CRS' indebtedness to Tri-State for shares of CRS common stock," the Chapter 11 Trustee expressed "that at least some of the Tri-State Entities have engaged in suspicious or lopsided business transactions with TSE."   Only by way of example, the Trustee flagged that TSE had paid the TSE entities $84 million more than it received during 2013 and 2014.  TSE paid more than $30 million to a related company called "Broadway PEO" without any "discernable reason."  Last, the TSE entities billed TSE around $20 million in "overhead allocations" during 2012 and 2013, without sufficient explanation.  The Chapter 11 Trustee stated that "there appears to have been a massive fraud involving the Debtor that may have filled the coffers of numerous Cassera-related

companies." The Chapter Trustee concluded that discovery was critical "to begin to untie what appears to be an intentionally complex, opaque, and inter-connected corporate structure."

### *Corporate Resource's Bankruptcy Proceeding Further Exposes the $100 Million Fraud and the Individual Defendants' Struggle to Evade Liability*

87.     Information revealed from Corporate Resource's bankruptcy proceeding further exposed R. Cassera and others' fraudulent use of TSE, the TSE entities, and Corporate Resource's assets. Notably, and without limitation, Feltman, the Chapter 11 Trustee for TSE's bankruptcy proceeding, again described the incestuous nature between Corporate Resource and TSE, stating that they were "joined at the hip." TSE maintained records on the same servers as Corporate Resource and the TSE entities, intermingling data. Feltman described that Corporate Resource and TSE "were interdependent such that one company did not operate without the other." He reiterated that "TSE did not have any of its own employees or its own independent management." Rather, "TSE was directed by the management and employees of [Corporate Resource] and certain other companies controlled by Robert Cassera, including Tri-State, to run its everyday operations." Adding some new color to the interconnectedness of these entities, Feltman stated that his investigation revealed "that employees would perform similar or related job functions for [Corporate Resource], [TSE entities], and TSE simultaneously without any clear separation." In addition, he discovered that "management would perform work for CRS, [TSE entities], and TSE. For example, Robert Cassera, John Messina, James Foley, Yolanda Caserra-Trippiedi and a small cadre of relatives of Mr. Cassera have been officers, directors, or otherwise have held positions of authority at [Corporate Resource] and TSE since TSE began operations." Feltman stated that "[i]t is no secret that, also due to their inseparable relationship, a subject of the Trustee's investigation has been what, if any, role [Corporate Resource] and [TSE entities] had in the disappearance of the $100 million." The SEC immediately filed its

30

"Joinder of U.S. Securities and Exchange Commission to Motion by Chapter 11 Trustee for Order Transferring Venue of Chapter 11 Case of Corporate Resource Services, Inc. and Its Affiliated Entities from the United States Bankruptcy Court for the District of Delaware to this District," noting the investigation and the Chapter 11 Trustee's assertion that the Company's filing in Delaware was a ruse to thwart the Chapter 11 Trustee's investigation in New York.

88.    On July 23, 2015, Corporate Resource and some of its affiliated entities ("Corporate Resource Debtors") filed a petition for protection from creditors under Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware.[4]  The Corporate Resource Debtors sought to operate their businesses as debtors-in-possession.  According to the Declaration of Victor in Support of the Chapter 11 Petitions ("Victor Declaration"), Victor, the Company's CRO, stated that the Corporate Resource Debtors had been engaged in "an orderly wind down of operations" since February 2015, liquidating assets, pursuing receivables, and reducing staff.

89.    Ignoring wholly that TSE was affiliated with Corporate Resource and wholly owned by R. Cassera, Victor stated that the Company's decision to wind-down its operation came after "it was discovered" that TSE had failed to pay what they believed, at the time, was $80 million in payroll taxes.  Victor continued that as a result, new financing that the Company had all but secured evaporated, and Wells Fargo "refused to continue funding the Debtors' ordinary course operations."  Wells Fargo, however, agreed to finance a wind-down of operations.  As a condition for that financing, Wells Fargo required Corporate Resource to file a

---

[4] The filers seeking protection are Corporate Resource Services, Inc., Accountabilities, Inc., Corporate Resource Development, Inc., Diamond Staffing Services, Inc., Insurance Overload Services, Inc., Integrated Consulting Services, Inc., The CRS Group, Inc., and TS Staffing Services, Inc.—all located at 160 Broadway, 13th Floor, New York, New York 10038.

petition for bankruptcy protection.  The Corporate Resource Debtors hired Riiska as its first CRO.  Riiska resigned on July 22, 2015, and the Company quickly replaced him with Victor.

90.     According to Victor, from February 2015 through the Company's bankruptcy filing, Wells Fargo tightly controlled both the Corporate Resource Debtors' cash and accounts receivable.  Victor continued that Wells Fargo "limited the use of the Debtors' borrowings from Wells Fargo, as well as the cash generated from the Debtors' business operations, collection of accounts receivable, and asset sales, to fund only the wind down of the Debtors, which, from Wells Fargo's perspective, was principally for the recovery of Wells Fargo's loans."  By so controlling the Company's wind-down, Wells Fargo extracted the entirety of its approximately $60 million in principal and interest from the Company, but it continued to control the Company's receivables and cash—a condition with which the Debtors strongly disagreed.

91.     Not only did the Company, through Victor, disagree with Wells Fargo's handling of the wind-down of its operations, but incredibly, it also cast blame on TSE.  According to Victor, TSE claimed that Corporate Resource owed it approximately $60 million.  "At a minimum," Victor stated, "the Debtors dispute this amount, and, based on the fact, among others, that *the actions of TSE in failing to at least pay tens of millions of dollars in taxes essentially brought an end to the Debtors' businesses and destroyed a company with approximately a billion dollars in sales in 2014, the Debtors believe they may have counterclaims and defenses that could eviscerate and/or exceed any claims of TSE against the Debtors*."  It was only after stating that the Company believed that it did not owe TSE any money for the failure to pay nearly $100 million in payroll taxes, that Victor acknowledged "some historic common board members and some common ownership interests among the Debtors and TSE (including the majority stockholder of Corporate Resource being the 100% indirect stockholder of TSE). . . ."

Thus, R. Cassera's CRO stated, without a hint of irony, that Corporate Resource and TSE "are deeply adverse to one another."

92.     Recognizing the Kabuki theater of the Victor Declaration and the Company's attempt to avoid the reckoning it would face in a parallel bankruptcy proceeding to TSE's in the Southern District of New York, on July 27, 2015, the Chapter 11 Trustee in the TSE bankruptcy filed an Application to Transfer Venue of the Corporate Resource Bankruptcy to the United States Bankruptcy Court for the Southern District of New York.  In support of this Application, the Chapter 11 Trustee, Feltman, filed another declaration with the Bankruptcy Court.

93.     Once again, Feltman described that Corporate Resource and TSE "were interdependent such that one company did not operate without the other."  He reiterated that "TSE did not have any of its own employees or its own independent management."  Rather, he continued, "TSE was directed by the management and employees of [Corporate Resource] and certain other companies controlled by Robert Cassera, including Tri-State, to run its everyday operations." Adding some new color to the interconnectedness of these entities, Feltman stated that his investigation revealed "that employees would perform similar or related job functions for [Corporate Resource], [TSE entities], and TSE simultaneously without any clear separation."  In addition, he discovered that "management would perform work for CRS, [TSE entities], and TSE. For example, Robert Cassera, John Messina, James Foley, Yolanda Cassera-Trippiedi and a small cadre of relatives of Mr. Cassera have been officers, directors, or otherwise have held positions of authority at [Corporate Resource] and TSE since TSE began operations."

94.     Feltman noted that "TSE also had no independent funding source or meaningful capital and instead relied on [Corporate Resource] to fund the outstanding Payroll Obligations (of which TSE incurred millions of dollars of on a daily basis) by billing [Corporate Resource]

for those obligations in arrears."  TSE maintained records on the same servers as Corporate Resource and the Tri-State Entities, intermingling data.  All shared office space with R. Cassera at 160 Broadway, New York, NY 10038.

95.     On the other hand, Corporate Resource relied upon TSE to process its payroll obligations and to obtain workers' compensation and medical insurance coverage for its employees.  Most critically, TSE was obligated to prepare and file hundreds of payroll tax returns each calendar quarter and to pay the related federal, state, and local tax obligations, which funds were paid to TSE from financing obtained through Corporate Resource's secured debt facility.

96.     Once again, Feltman then described his "investigation into TSE's financial affairs and potential claims," focusing on "the inseparable relationship between TSE, [Corporate Resource], and other affiliates and any potential wrongdoing or fraud that combination may have been intended to obfuscate."  Feltman was seeking answers about the roles of both Corporate Resource and the TSE entities in the missing $100 million of withholding taxes, the conversion of $12 million in debt into common stock, an outstanding receivable of at least $52 million due to TSE, and "any possible fraud or wrongdoing by [Corporate Resource], TSE, and their affiliates or any of their employees or management"

97.     Given this background, Feltman in the application called the Company's filing of its Chapter 11 petition in Delaware "an obvious attempt to thwart the Trustee's investigation." His application continued:  "But TSE and CRS are so closely connected and their operations so intertwined that [Corporate Resource's] chapter 11 case should be administered in the same court and presided over by the same judge and therefore must be immediately transferred to New York."  He stated that the two entities were "joined at the hip," sharing servers and office space.

"[Corporate Resource] needed TSE to process payroll and secure insurance for its thousands of part-time employees at bargain basement prices; TSE relied upon [Corporate Resource], its life support, for all of its funding and to operate."

98.      With respect to his investigation, Feltman, somewhat sardonically referred to the "discovery" of the $100 million payroll tax shortfall twice in quotations, noting that "[t]his 'discovery' took place with employees from [Corporate Resource] and [TSE entities] (another group of CRS affiliates) managing TSE.   TSE had no employees of its own."   Feltman concluded, that "[i]t is no secret that, also due to their inseparable relationship, a subject of the Trustee's investigation has been what, if any, role [Corporate Resource] and [TSE entities] had in the disappearance of the $100 million"

99.      The SEC immediately filed its "Joinder of U.S. Securities and Exchange Commission to Motion by Chapter 11 Trustee for Order Transferring Venue of Chapter 11 Case of Corporate Resource Services, Inc. and Its Affiliated Entities from the United States Bankruptcy Court for the District of Delaware to this District," noting the investigation and the Trustee's assertion that the Company's filing in Delaware was a ruse to thwart the Trustee's investigation in New York.

***Several Former Employees Confirmed and Facts Reflect that the Individual Defendants Were Aware of or, at the Least, Recklessly Disregarded the Fraud Throughout the Class Period***

100.      Well before the Class Period, R. Cassera and a TSE entity had at least one lien against it for the very issue underlying the fraud alleged herein, employee withholding tax.  As early as around July 21, 2011, the Commonwealth of Pennsylvania Department of Revenue filed a tax lien for employer withholding tax amounting to $4,900.59 against R. Cassera and Tri State Entertainment Production Peo Inc.

101.    Also, well before the Class Period, Defendants should have been aware of TSE's woefully inadequate record keeping.  Neil Messina served as president of TSE from 1997 to 2011, according to his LinkedIn profile.[5]  Also, Neil Messina was sentenced to 18 years in federal prison in April 2014 for his role in a botched 1992 home invasion robbery that left a man and his dog dead.  He was arrested in January 2011.  But TSE did not disclose this when filing vendor-responsibility forms with the New York state comptroller in February 2012.  These forms require prospective contractors to disclose whether any of their officials were under investigation or had been charged with any crimes for the previous five years.  Susan Kennedy, TSE's vice president of government sales, answered "no" and provided no information about Neil Messina's widely publicized arrest.  But "[e]veryone knew who he was, … [it] certainly raised some eyebrows[,]" said one source with knowledge about the company's inner workings.

102.    Several confidential FEs confirmed that the Individual Defendants knew about or, at the least, recklessly disregarded that TSE was not paying federal withholding taxes on behalf of Corporate Resource's internal and placed employees and that this withholding-tax liability, once revealed, would devastate the Company's survival.  Notably, and without limitation, Corporate Resource retained Crowe in late-2013 to audit its financial statements.  Crowe then learned about the material tax-withholding liability in auditing TSE's financial statements and raised this issue with Corporate Resource's senior-most executives, who decided not to disclose the liability.  The FEs even said that some of the Individual Defendants specifically knew about the material tax-withholding liability.

103.    The FEs explained that this approaching train wreck was well known throughout and even before the Class Period, stating, without limitation, the following:

- Corporate Resource bought TSE entities but left TSE with the payroll division;

---

[5] Michael Gartland, *Firm with gov't contracts 'hired' accused killer, mobster*, N.Y. POST, Feb. 17, 2015.

- TSE's senior-most executives, including some of the Individual Defendants, were the same as or, at the least, controlled Corporate Resource's senior-most executives;

- TSE's payroll division was supposed to calculate and pay taxes on behalf of Corporate Resource's internal and placed employees;

- A separate Corporate Resource payroll division was responsible for monitoring TSE's payroll division;

- TSE and Corporate Resource's senior-most executives, including the Individual Defendants, had access to and reviewed information concerning Corporate Resource's internal and placed employees' taxes;

- Corporate Resource and TSE's senior-most management were well aware that if Wells Fargo learned about any unpaid tax liability, Corporate Resource and TSE's funding would be jeopardized; and

- Several Corporate Resource employees fled the Company when learning about these issues, including at least one employee noting the unethical manner in which the unpaid tax liability was handled.

104.    According to FE1[6], in early 2014, TSE circulated companywide emails announcing that it was going public and would operate as Corporate Resource.  When the TSE entities hired FE1 in 2010 to establish a staffing agency in Allentown, Pennsylvania, FE1 interacted with R. Cassera.  At times, FE1's branch had as many as 500 employees placed at local businesses.  According to FE1, when the TSE entities "rolled over" into Corporate Resource, the letterhead and office signage was changed to Corporate Resource, and their branch operated as Corporate Resource.  The TSE entities' employees' email addresses changed from @tristateemployment.com to @crs.com.  The TSE entities' computer systems became Corporate Resource's computer systems.  The TSE entities' corporate headquarters on Broadway in New York City became Corporate Resource's corporate headquarters.  All of the TSE entities' staffing services became a part of Corporate Resource.

---

[6] FE1 was a selling branch manager for the TSE entities from September 2010 to early-2014 and then continued to work for Corporate Resource until March 2015.  FE1 initially reported to Joe Cornato, a vice president at the TSE entities, and when the TSE entities began operating as Corporate Resource, FE1 began reporting to Kevin Case, a regional vice president of Corporate Resource.  FE1 was responsible for placing employees at locally operated businesses, including FedEx, NeoVia Logistics, and Customized Distribution Services.

105.    FE2[7] corroborated FE1's description of the TSE entities not having been truly

distinct from Corporate Resource.  FE2 said that Messina, Golde, Greg Schulte ("Schulte"), a

vice president of finance, Alex Sellas ("Sellas"), a vice president of financial planning and

analysis, and several other high-level Corporate Resource executives spent considerable time in

TSE's corporate headquarters, located two floors above Corporate Resource's office in New

York.  Indeed, Messina's office was actually located in TSE's headquarters.  FE2 said that the

TSE entities and Corporate Resource worked "hand-in-hand" and did not appear to operate as

two separate companies:  "It wasn't a real separation.  It wasn't like two separate businesses."

According to FE2, TSE directed Corporate Resource's actions:  "Whatever TS Employment

would say, we would have to do it."  FE3[8] corroborated this by saying that Messina was a joint

employee with the TSE entities.  According to FE3, Messina's day-to-day office was at TSE, and

he only used the Corporate Resource office for occasional meetings, even though both

companies' headquarters were at 160 Broadway in New York.

106.    FE4[9] said that J. Cassera held senior positions at both Corporate Resource and the

TSE entities and that he received paychecks from both companies.  FE4 said that there was never

a clear understanding of where the lines were drawn between the companies, nor did the leaders

understand it.  "I never understood how it worked," FE4 said.  "I don't think they (the Cassera

family) understand what they created."

107.    FE3 said that R. Cassera, who owned TSE, owned approximately 80% of

Corporate Resource's common stock.  FE3 said that R. Cassera had several family members

---

[7] FE2 worked as a senior accountant at Corporate Resource's headquarters in New York from March 2014 through March 2015.  He reported to Greg Schulte, a vice president of finance, who reported to Golde.

[8] FE3 was an accounting manager at Corporate Resource's headquarters in New York from May 2011 through June 2014.  FE3 reported to Greg Schulte, a vice president of finance, who reported to Golde.

[9] FE4 worked as a staff accountant and payroll manager at the TSE entities from November 2006 through April 2015.  FE4 reported to J. Cassera and Yolanda Caserra-Trippiedi.

working at the TSE entities' headquarters, including his sisters, Yolanda Caserra-Trippiedi ("Trippiedi") and Maria Ursino ("Ursino"). Trippiedi was also on the board of directors of a Corporate Resource subsidiary. FE5[10] corroborated that many of the executives at Corporate Resource and the TSE entities were related.

108. FE6,[11] who worked exclusively for Corporate Resource, also noted the dominance that R. Cassera's family had over Corporate Resource. FE6 said that when needed to hire internal Corporate Resource employees, he would seek the approval of Mark Levine ("Levine"), then Corporate Resource's President and COO. Even when Levine approved, he would still have to answer to Ursino, who held a senior position at the TSE entities. FE6 said that the TSE entities generally controlled Corporate Resource, including in connection with payroll.

109. According to FE1, even when the TSE entities began operating as Corporate Resource, many of the TSE entities' executives and employees were promoted or switched to titles at Corporate Resource. Indeed, FE1's paychecks were paid by the TSE entities, even when working at Corporate Resource.

110. According to FE1, the only function that remained at TSE was the payroll division. This division never became a part of Corporate Resource. But FE1 said that TSE's payroll division's email changed from payroll@tristateemployment.com to payroll@crs.com. FE2 corroborated this, saying that TSE handled all payroll functions for Corporate Resource. TSE processed paychecks and was supposed to pay taxes for all internal Corporate Resource employees and placed employees at the Company's clients' businesses. Corporate Resource paid TSE a management fee for these payroll services.

---

[10] FE5 was an executive vice president of on-site operations at Corporate Resource from July 2012 through May 2015. FE5 reported to Mark Levine, President and COO at Corporate Resource.

[11] FE6 was a vice president in several departments at Corporate Resource between November 2012 and March 2015. He reported to Matt Vaccaro, an executive vice president at Corporate Resource, and Jay Pochini, another executive vice president at Corporate Resource.

111.    FE4 said that TSE's payroll department was responsible for calculating the amount of federal payroll tax due when processing payroll checks for Corporate Resource's internal and placed employees.  FE4 oversaw the staff that processed paychecks for Corporate Resource's placed employees at the Florida businesses.  FE4 said that the TSE payroll department used a payroll software system to determine how much to withhold for federal taxes from paychecks.  When the paychecks were printed and sent to employees, the federal taxes were withheld.  FE4 then said that the New York headquarters was then responsible for accessing the same payroll software system to see the amount of federal taxes withheld.  The New York headquarters was responsible for making those payments.  FE4 said that the TSE entities' accounting department in New York was led by Trippiedi and Joe Lynch, who was in TSE's payroll department at New York and was involved in Corporate Resource's employees' tax withholding.  FE4 said that after completing the processing of the paychecks, it was the team at New York headquarters that actually paid the taxes to the IRS.  FE4 said that the alleged $100 million tax liability was due from Corporate Resource employees.  FE4 said that all payments by the TSE entities were approved by R. Cassera, Trippiedi, and Kuris, who was a corporate controller of the TSE entities.  "And finally everything got approved by Robert Cassera.  No payment went out without him knowing about it."  FE5 corroborated the relatively tight spending approvals needed at Corporate Resource.  FE5 said that every little payment had to get approval from Corporate Resource's COO and even often from Messina.

112.    According to FE2, Corporate Resource also maintained its own separate payroll department responsible for ensuring that the money paid to TSE to cover taxes and payroll was accurate.  FE2 said that "Payroll was making sure CRS was paying actually what was owed, making sure that everything internally with CRS, all the taxes and all the money for payroll is

being allocated."   FE2 believed that Corporate Resource's payroll department may have been communicating with TSE's payroll department about taxes owed.

113.    According to FE1, clients paid the TSE entities weekly for the total amount of hours that placed employees worked, plus a "mark-up" fee of about 35% intended to cover the placed employees' payroll taxes, workers' compensation, social security, unemployment, and the TSE entities' overhead fees.   TSE's payroll division then wrote paychecks directly to the placed employees.  FE2 corroborated this.  FE2 said that Corporate Resource's clients paid hourly rates or salaries for placed employees plus a margin that was supposed to cover taxes, benefits, and Corporate Resource's overhead and administrative fees.   These margins also covered the administrative fees that Corporate Resource paid to TSE to process payroll for the placed employees.  FE3 corroborated this, saying that Corporate Resource sometimes paid TSE as much as $15 million on a daily basis to fund employees' paychecks, taxes owed to state and federal governments, and management fees.   FE3 said that TSE was responsible for remitting tax payments to state and federal governments.

114.    FE2 said that the fees that TSE was charging Corporate Resource for payroll services was too high.   FE2 was in charge of executing Corporate Resource's cash transacting, reconciling cash accounts and payments, preparing accounts-payable reports, keeping Corporate Resource and the TSE entities informed about daily cash flow, and working on other ad-hoc projects.   When FE2 asked the TSE entities to explain these fees, he was unable to get convincing responses.  "We were trying to figure out what we (CRS) owed them (TSE) in terms of fees," FE2 said.  FE2 said that this overcharging occurred more than once a quarter.  FE2 said the overcharging was a decent amount that would prompt questions.

115.     FE2 said that Corporate Resource transferred large sums of money to TSE every day to cover the payroll checks for placed employees and internal Corporate Resource employees, all taxes, and TSE's management fee.  TSE told Corporate Resource how much cash they needed to cover payroll each day, and Corporate Resource transferred it.  If TSE needed more cash than Corporate Resource had in its cash account, Corporate Resource would obtain the extra money through a bigger credit line from the bank.

116.     FE2 said that Nina Kurtis, a controller for the TSE entities, or her staff typically called FE2 each day to tell him how much cash needed to be transferred.  This amount would cover tax liabilities.  This transfer amount required Messina's approval.  If Corporate Resource had insufficient funds to meet TSE's demand, Sellas would call the bank to obtain a higher credit line.  Corporate Resource transferred millions of dollars a day to TSE to cover payroll and taxes that TSE was supposed to pay on Corporate Resource's behalf.

117.     FE1 and her staff on a weekly basis submitted to the TSE payroll division the total hours that placed employees worked for each client.  Each placed employee's hours were inputted into TSE's internal Apex software system.  Using the Apex system, TSE's payroll division then prepared paychecks for employees.  They were paid directly by TSE—not by the companies that they were placed at.  TSE's payroll division was responsible for paying taxes for the placed employees.

118.     FE3 said that Corporate Resource and the TSE entities both had access to a computer system that allowed for an automated process to submit time sheets for placed employees.  FE3 said that much of the work TSE did in processing payroll was done manually.  FE3 said that when she or her coworkers learned about inaccurate withholding-tax calculations, TSE often pushed back and denied the mistakes.  FE3 said that this pushback was difficult to

handle because the TSE entities' senior managers were R. Cassera's family members. According to FE3, they were also arrogant and felt that they knew what they were doing because they had been doing it for 15 years.

119.    FE6 said that Corporate Resource and the TSE entities shared an information-technology department.

120.    FE7[12] said that senior executives at the TSE entities could have ran reports on taxes due at any given time from TSE's computer system, Apex.   FE7 said that Apex was used to process payroll information, including payments to temporary employees, taxes withheld, taxes owed, and other information.   FE7 said that the TSE entities' senior executives "must have" or should have known about the payroll tax liability early on.

121.    FE8[13] said that each week, payroll managers submitted email reports generated by TSE's database to Maria Ursino, a vice president of payroll at the TSE entities, which totaled gross margins from each PEO client and tallied all federal, state, and local taxes due for that client.   FE8 said that Tom Cassera (J. Cassera and R. Cassera's brother), and Nina Kuris, who was a corporate controller at the TSE entities, were copied on these emails.   FE8 assumed that Ursino would have submitted these weekly reports to R. Cassera.   FE8 processed payroll services for several of the TSE entities' clients, including Corporate Resource.

122.    FE8 said that R. Cassera and Messina were aware of material tax-withholding liability.

---

[12] FE7 worked as a support specialist and business analyst at the TSE entities' headquarters in New York from February 2001 to May 2015.   FE7 reported to Peter Ursino, vice president of payroll at the TSE entities.

[13] FE8 was a payroll specialist at the TSE entities' New York headquarters from April 2005 to April 2015.   She reported to Peter Ursino, a vice president of payroll at the TSE entities, and Maria Ursino, a vice president at the TSE entities, who reported directly to R. Cassera.

123.    FE9[14] said that monthly reports tallying payroll revenue and expenses were ultimately passed up to Corporate Resource's CFO.  These monthly reports were generated from mass imports of payroll data form Corporate Resource's staffing-agency subsidiaries, which included hours worked by temporary and permanent employees, hourly rates, and city, state, and federal tax liabilities.  This information was used to process paychecks for placed employees.  FE9 believed that the computer system used to tally these reports presumably had the capability to run tax-liability reports.  FE9 based this belief on the paychecks being processed by the computer system showing how much was withheld for different tax liabilities.

124.    FE3 said that Corporate Resource retained Crowe in late 2013 to conduct a third-party audit of the TSE entities in preparation for Corporate Resource's financial statements.  "It was a last minute switch," FE3 said, they "had to rush."  FE3 said that "they came in right before the year ended, and they were doing the whole audit for the year-end financial statement."  FE3 said that prior to Crowe, Corporate Resource was using Rosen Seymour Shapss Martin & Company LLP.  FE3 said that Crowe conducted a more-detailed audit of Corporate Resource and began reviewing the TSE entities' files because of its financial relationship with Corporate Resource.

125.    FE3 said that "[when] they came in, they were much more detailed.  They were breaking out everything, reviewing three years back.  When they started seeing that a lot of the operations, a lot of the reporting, and information went between TSE and CRS, they started checking out TSE more closely.  They started digging into more stuff at TSE more closely.  They wanted to vet TSE's processes, especially since TSE did not have a staff verifying their processes."

---

[14] FE9 worked as an accounting manager at Corporate Resource from January 2012 to May 2012.

126.     During this audit, Crow discovered tax liabilities at TSE for unpaid payroll taxes. Crowe began to investigate this at TSE.  FE3 said that Crowe discussed their concerns about TSE's tax liability with Corporate Resource's senior management, including Golde and Schulte, in early-to mid-2014.  Crowe requested more information from TSE about the tax liability.  But TSE pushed back.  FE3 recalled discussing what Crowe needed with Trippiedi, who was R. Cassera's sister and a high-level executive at the TSE entities and a Corporate Resource subsidiary.  But the TSE entities' management, including Trippiedi and Ursino, also R. Cassera's sister and a senior employee at the TSE entities, did not understand why Crowe was auditing TSE.  "There was a lot of push back again from Yolanda," FE3 recalled, and "they'd say, 'Why do they need this information.  We are not the ones being audited.'"  FE3 tried explaining that the auditors needed the data because so much of Corporate Resource's financial transactions passed through the TSE entities, and because it was required for financial reporting.  FE3 said that TSE eventually cooperated, but it further delayed the financial reporting process.  According to FE3, Corporate Resource was several months late in filing its 2013 year-end financial reports due to the roadblocks with this audit.

127.     FE3 said that senior Corporate Resource executives, including Golde and Schulte, decided that Corporate Resource did not have to disclose the material tax-withholding liability in the Company's public financial statements because it did not own TSE.  But FE3 said that they were initially on the fence about reporting it.  FE3 is confident that Golde would have discussed this issue with Messina.  FE3's belief is based on the fact that this issue delayed Corporate Resource's filing of the financial statements, and anything that delayed these filings was discussed with the upper-most echelons of Corporate Resource, including R. Cassera.  FE3 said that Crowe reported directly to Corporate Resource's Audit Committee.

128.     FE3 said that the material tax-withholding liability would have violated Corporate Resource's credit line with Wells Fargo.  According to FE3, if Wells Fargo learned about the material tax-withholding liability, Wells Fargo would have placed more restrictions on Corporate Resource or canceled the credit line.  Wells Fargo paid close attention to Corporate Resource's liability to the TSE entities.  If this liability increased, Wells Fargo would have demanded an explanation and urged that it be lowered.  FE3 said that Corporate Resource was not allowed to have any liens on any of its companies.  FE3 recalled emails from Wells Fargo alerting Corporate Resource that a lien popped up on one of Corporate Resource's businesses and that Corporate Resource would have to immediately deal with it to maintain the credit facility with Wells Fargo.  FE3 said that the TSE entities submitted Corporate Resource's invoices to Wells Fargo, so that Wells Fargo could see the amount of cash that was expected to come to Corporate Resource in the near future.  Wells Fargo funded Corporate Resource based on a percentage of the Company's invoices.

129.     FE3 said that Corporate Resource owed the TSE entities more than $50 million for back payroll that the TSE entities covered while Corporate Resource was starting its business when FE3 began working there in May 2011.  FE3 explained the arrangements.  Then, Corporate Resource did not have a funding agreement with Wells Fargo nor much revenue.  Corporate Resource was gradually paying down this "liability."  But by the time that Corporate Resource was able to cover its payroll and tax costs, the Company was already deeply indebted to the TSE entities.  "It was an ongoing TSE fronting of the money for these temps (temporary employees payroll) until the company could pay it down," FE3 said.  By the time FE3 left Corporate Resource in June 2014, Corporate Resource owed the TSE entities tens of millions of dollars.  FE3 said that both companies kept tabs on what the amount was on a daily basis.

130.    FE3 said that when joining Corporate Resource in May 2011, the Company was acquiring two to three companies at a time.  But by the time FE3 left, Corporate Resource acquired at least nine companies at a time.  FE3 said that many of the companies that Corporate Resource acquired had been owned by the TSE entities.  Some of these purchases were stock-trade agreements.

131.    FE2 prepared account-receivable reports for Corporate Resource that showed that the Company was not earning enough in some regions to cover its costs and that the Company was not doing well.  FE2's reports were submitted to the vice president of finance at Corporate Resource and were likely passed up the management chain.  FE2 noticed that Corporate Resource suffered from high overhead rent costs due to many redundancies after acquiring other staffing agencies.  FE2 said that paying rents on several offices and salaries for the employees at those offices caused high overhead costs for the company.  This cut into the margins charged to clients and led to branches and regions not earning enough to cover costs.  FE2 said that some large, nationwide clients wanted an "across-the-board" margin for all regions of the nation.  FE2 explained that in an effort to keep clients, Corporate Resource would accept lower margins that might work in less expensive areas of the country where costs were lower, but this did not work in more-expensive areas where Corporate Resource's costs were higher.

132.    FE2 noticed that several employees left Corporate Resource in the months leading to TSE's bankruptcy petition because they knew that Corporate Resource was not doing well. FE2 said that some of these employees included Schulte and Golde.

133.    FE10[15] corroborated this by saying that several high-ranking Corporate Service employees, including, without limitation, Kevin Case, who was a vice president of sales and

---

[15] FE10 worked as a Corporate Resource branch manager from June 2014 to April 2015.  FE10 reported to Kevin Case, a vice president of sales and operations at Corporate Resource.

operations at Corporate Resource, left the Company months and weeks before the Company announced TSE's financial problems in February 2015.  FE10 said about 15 high-ranking people left.

134.    FE6 said that Sellas abruptly quit in February 2015.  "As soon as the checks started bouncing, something happened on his end," FE6 said.  FE6 said that "I don't know if he found out about the $100 million tax debt or what. He quit immediately."  FE6 said that he had a brief conversation with Sellas, and Sellas told him, "There's a lot of stuff I'm finding out now that is completely unethical, and I don't want to have anything to do with these people."  FE6 noted that Sellas did not have any control over the Company's finances, but rather, "he took orders directly from (CFO Michael) Golde and John Messina."

### The Individual Defendants Had Motive to Artificially Inflate Corporate Resource's Common Stock to Effectuate Its Growth Through Serial Acquisitions and Related-Party Transacting

135.    Corporate Resource was committed to growing through serial acquisitions.  The type and number of Corporate Resource's services grew largely through acquiring established offices from general staffing companies.   According to a Corporate Resource investor presentation in June 2013, Corporate Resource had grown by having "completed six major acquisitions of regional staffing agencies in the last four years, in addition to multiple tuck-in acquisitions.  By uniting these staffing specialists under one brand, the company [was] growing at a rapid pace with revenues in the $800 million/year range presently, with plans to expand its current service offerings through organic growth and acquisitions and by maximizing the potential within the high-growth segments it serves."

136.    Several of Corporate Resource's acquisitions were effectuated with the Company's common stock and directly paid to TSE entities and R. Cassera.

137.    Corporate Resource's subsidiary the CRS Group, Inc. provided software and related hosting and technology services through its Summit Software division.  On May 6, 2013, Corporate Resource acquired the Summit Software division from Tri-Tel Communications, Inc., which was affiliated with TSE, for approximately $13.75 million by issuing 21,000,000 shares of Corporate Resource common stock.

138.    Corporate Resource's subsidiary Diamond Staffing Services Inc. ("Diamond") provided administrative, light industrial, and professional staffing solutions throughout the United States.  Diamond was previously named Tri-Diamond Staffing Inc., a TSE affiliate, which Corporate Resource acquired from R. Cassera on January 31, 2011 for approximately $25 million by issuing 29,411,765 shares of Corporate Resource common stock.

139.    Corporate Resource's subsidiary Insurance Overload Services, Inc. ("ISO") provided professional insurance-industry-staffing solutions for personnel in claims processing, customer services, and related fields throughout the United States.  ISO was previously named Tri-Overload Staffing Inc., which was owned by TSE affiliate TS Staffing Corp. and which Corporate Resource acquired from R. Cassera on August 27, 2010 for approximately $6.2 million by issuing 8,589,637 shares of Corporate Resource common stock.

140.    Corporate Resource's subsidiary TS Staffing Services, Inc. ("TS Staffing") provided temporary-placement solutions across a range of administrative and professional fields throughout the United States.  On November 21, 2011, Corporate Resource acquired TS Staffing, which was a TSE entity.  Corporate Resource paid R. Cassera $30 million through issuing an aggregate of 34,839,159 shares of Corporate Resource common stock.

141.    The Individual Defendants through related-party loans also benefitted from artificially inflating Corporate Resource's common stock.  For example, Corporate Resource

entered into a conversion agreement dated as of March 30, 2012 with the TSE entities, where the Company converted $12 million of debt that it owed into 25,962,788 shares of the Company's common stock and gave it to the TSE entities.  On July 31, 2012, Corporate Resource converted an additional $2.1 million of debt that it owed into 4,543,488 shares of the Company's common stock and gave it to the TSE entities.  R. Cassera, with full knowledge of the tax and workers' compensation obligations that the TSE entities and Corporate Resource were responsible for, caused Corporate Resource to transfer over 30 million shares of its common stock to the TSE entities.

### *The Nature of the Fraud Involved and the Individual Defendants' Roles and Disclosures Throughout the Class Period Reflect that They Knew About or, at the Least, Recklessly Disregarded the Fraud*

142.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Corporate Resource, their control over, and receipt or modification of the Company's allegedly materially misleading misstatements, and their associations with the Company, which made them privy to confidential proprietary information concerning Corporate Resource, participated in the fraudulent scheme alleged herein.

143.    The fraud alleged herein implicates Corporate Resource's core operations.  The Company's financial performance, main financing source, accurate withholding and paying of federal payroll tax for its internal employees and employees placed at its clients, especially because it is a staffing company, and retention of its upper-most echelon of executives are at the heart of Corporate Resource's survival.

144.    In light of these facts, knowledge of the alleged improprieties and lack of internal controls is imputable to the Individual Defendants, given the implication of core operations and the Individual Defendants' roles and statuses within Corporate Resource.

145.    As the individuals who signed or were quoted in the alleged false and misleading statements described herein, the Individual Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.  As the individuals who certified the SEC filings pursuant to the Sarbanes-Oxley Act of 2002, the Individual Defendants were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

146.    Several of the Individual Defendants were senior executives at both Corporate Resource and TSE: Messina, J. Cassera, R. Cassera, and Foley.

147.    The Individual Defendants on the Audit Committee, Amato, Clarke, Melby, and Holzer, were responsible for scrutinizing potential conflicts with TSE.  For example, according to the 2013 10-K, while Corporate Resource did "not have any written policies or procedures in place that address potential conflicts of interest arising from Mr. Messina's employment with TSE and his management responsibilities with us, we intend to present any potential conflicts that may arise in the future to our Audit Committee for their review."

148.    According to the 2013 10-K, the Individual Defendants who were Directors of Corporate Resource's Board, R. Cassera, J. Cassera, Altucher, Foley, Amato, Clarke, Melby, and Holzer, had "responsibility for risk oversight.  The oversight responsibility of the Board is enabled by management reporting processes that are designed to provide visibility to the Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies.  These areas of focus include strategic, operational, financial and reporting, succession and compensation, compliance, and other risks."

149.    The Individual Defendants' own disclosures throughout the Class Period reflected that they were aware of and reviewed information bearing on the TSE entities and R. Cassera's ability to dominate Corporate Resource.  For example, the 2013 10-K stated that "our principal stockholder, whose affiliated entities are engaged in multiple transactions with us, beneficially owned, together with its affiliated entities and persons, approximately 141,647,000 of our outstanding shares of common stock as of January 3, 2014 , and his interests may conflict with our interests and those of our other shareholders."

150.    Also, the Individual Defendants' own disclosures throughout the Class Period reflected that they were aware of and reviewed information bearing on the importance of securing financing from Wells Fargo.  For example, the 2013 10-K stated that failure to "comply with any of [the APAs] covenants, including the financial coverage ratios, could cause an event of default under and/or accelerate some or all of our indebtedness, which would have a material adverse effect on us."

151.    In connection with the internal controls and procedures over Corporate Resource's disclosures and financial reporting, the Individual Defendants' own disclosures throughout the Class Period reflected that they were aware of and reviewed information bearing on the Company's woefully inadequate internal controls.  For example, the 2013 10-K stated, in pertinent part, as follows:

> Our management, with the participation of our President and Chief Executive Officer and our Chief Financial Officer, has determined that we have material weaknesses in our internal control over financial reporting as of January 3, 2014 related to our information technology systems as well as an inadequate control environment around the technical knowledge, application and procedures required to assure compliance with generally accepted accounting principles in the United States ("U.S. GAAP").

*       *       *

As a result of this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of January 3, 2014 because of the material weaknesses set forth below.

*       *       *

**• Financial Accounting and Reporting**

Management identified that we had: inadequate controls over journal entries and approvals; had inadequate account reconciliation controls; lacked sufficient personnel with knowledge, experience, and training in U.S. GAAP; lacked a formalized process for determining, documenting, communicating, implementing, monitoring or updating accounting policies and procedures; and lacked effective controls over the period-end financial close and reporting processes. The foregoing weaknesses resulted in actual or potential misstatements in many accounts including: accounts receivable; equity based compensation; equity method intangible assets including goodwill; and provision for income taxes. Based on the nature of noted deficiencies, management concluded that each of these deficiencies resulted in a reasonable possibility that a material misstatement in our interim our annual financial statements would not be prevented or detected on a timely basis, and as such, each of these constitutes a material weakness.

**• Information Technology General Controls**

Management identified a number of deficiencies related to the design, implementation and effectiveness of certain information technology general controls, including segregation of duties, user access, change management, data back-ups, and hardware security, some of which have a direct impact on our financial reporting. Based on the nature and interrelationship of the noted deficiencies, management concluded that these deficiencies, in the aggregate, resulted in a reasonable possibility that a material misstatement in our interim or annual financial statements would not be prevented or detected on a timely basis, and as such, constitutes a material weakness.

***Exodus of Corporate Resource's Executives, Audit Committee, and Auditors***

152.    Another indicator of scienter is the removal of key executives and officers during or shortly after the Class Period.  Such demotions, resignations, and departures, which were highly suspect in timing, strongly support the scienter inference, most of which occurred at the height of the fraud alleged herein

153.   Since the beginning of the Class Period on July 1, 2014, Defendants were aware of the exceptional turnover within Corporate Resource's upper-most management.  For example, the 2013 10-K disclosed the following:

> **We are highly dependent on our senior management and their continued performance and productivity; in the past, we experienced significant management turnover, which may result in operational inefficiencies that could negatively affect our business.**
>
> *       *       *
>
> Since fiscal year 2009 we have experienced significant turnover in our senior management. In fiscal year 2009, we experienced changes in our President and Chief Executive Officer positions. In fiscal year 2010, our Chief Financial Officer resigned. In fiscal year 2011, we appointed a new Chief Financial Officer and President of Sales. In Fiscal Year 2012, our Chief Financial Officer was terminated and we appointed a successor. On October 8, 2012, our Chief Executive Officer resigned and our President assumed the role of Chief Executive Officer as well as Chairman of the Board.

154.   On January 3, 2014, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing that on December 27, 2013, the Audit Committee dismissed Rosen Seymour Shapss Martin & Company LLP as the Company's independent registered public accounting firm.  On that same day, the Audit Committee engaged Crowe as the Company's independent registered public accounting firm.

155.   On September 29, 2014, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing that Amato resigned from the Board and the Audit Committee chair effective September 28, 2014.  Holzer became the Company's new Board member and Audit Committee chair on September 29, 2014.

156.   On January 12, 2015, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing that Golde resigned as CFO effective that day.  Joseph P. Ciavarella became the Company's new CFO.

157.     On February 6, 2015, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing that R. Cassera resigned as a Board member effective on February 4, 2015.

158.     On February 10, 2015, Corporate Resource filed a Form 8-K with the SEC ("2/10/15 Form 8-K"), which was signed by Messina, disclosing the abrupt resignations of Clarke, Holzer, and Melby—the Audit Committee members—effective February 5, 2015.

159.     On that same day, Corporate Resource disclosed the abrupt resignation of Joseph P. Ciavarella as CFO effective February 20, 2015.  He had joined Corporate Resource as a CFO on January 12, 2015.

160.     On that same day, Corporate Resource disclosed the immediate resignation of Gina Russo as corporate secretary.

161.     On that same day, Corporate Resource disclosed the abrupt resignation of Defendant Altucher effective immediately.

162.     On that same day, Corporate Resource disclosed that Crowe resigned effective February 9, 2015, and that the Company was thus unlikely to file its annual report on Form 10-K in a timely manner.

### Defendants' False and Misleading Statements

163.     The Class Period begins on April 26, 2012, when Corporate Resource filed with the SEC a Form 8-K, detailing a transaction with TSE over unpaid debt.  According to this Form 8-K, on March 30, 2012, TSE and Corporate Resource executed a "Conversion Agreement," "provid[ing] for the issuance of 25,962,788 Shares [the "Issuance"] to TSE[] in exchange for the conversion of $12 million in debt owed to it by the Company."  The Conversion Agreement assigned a per share value to the shares, based on a purportedly independent business valuation,

of $0.4622.  The valuation considered, among other factors, "the Shares' lack of liquidity, the concentration of ownership of the Shares and other information provided by the Company's management."  Corporate Resource executed the agreement to satisfy a debt obligation to TSE of approximately $12.5 million, as of December 31, 2011.  In a press release announcing the deal, then CEO J. Schecter stated, "[t]his debt conversion significantly strengthens CRS's balance sheet and we continue to evaluate other steps to enhance shareholder value."

164.    On May 14, 2012, Corporate Resource filed with the SEC a Form 10-Q for the quarterly period ended March 30, 2012, which was signed by J. Schecter and S. Schecter, stating, in pertinent part, that on "March 30, 2012, the Company and TS Employment entered into an agreement to convert $12 million of this loan payable into 25,962,788 shares of the Common Stock, at a value per share of $0.4622."

165.    The statements in ¶¶163-64 above were repeated in all material respect in each of the Company's Forms 10-Q filed with the SEC on (i) August 13, 2012 for the quarterly period ended June 29, 2012, which was signed by J. Schecter and Golde, (ii) May 20, 2013 for the quarterly period ended April 5, 2013, which was signed by Messina and Golde, (iii) August 14, 2013 for the quarterly period ended July 5, 2013, which was signed by Messina and Golde, and (iv) November 14, 2013 for the quarterly period ended October 4, 2013, which was signed by Messina and Golde.  The statements were also repeated in all material respect in the Company's Form 10-K filed with the SEC on December 21, 2012 ("2012 10-K"), which was signed by Messina, Golde, J. Cassera, R. Cassera, Alutcher, and Foley.  The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Messina and Golde attesting to the accuracy of the financial condition and results of operations of the Company.

166.     The statements referenced in ¶¶163-165 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that the unpaid debt that Corporate Resource attempted to satisfy involved, at least in part, material, unpaid payroll taxes.   Given the illiquidity of the shares, however, the TSE entities would not be able to convert the shares to cash in satisfaction of the payroll obligation.   The statements referenced in ¶¶163-165 above were materially false and/or misleading also for the reasons stated in ¶¶167-170 below.

167.     Defendants, themselves, through an agent acknowledge this.   In opposition to one of the Chapter 11 Trustee's motions, R. Cassera caused TSE to file the "Declaration of Irwin Kossoff in Support of Objection to Ex Parte Application of Chapter 11 Trustee."   Irwin Kossoff ("Kossoff"), a partner in a six-accountant, eponymous firm, claimed to have been the TSE entities' accountant since 1995.   According to Kossoff, his firm "reviews and reconciles the books and records of [TSE] and the Tri-State Entities on a quarterly and annual basis," prepares their tax returns, and, among things, their forms 941, reporting payroll tax withholdings to the IRS.   While contesting the Chapter 11 Trustee's accusation of a "massive fraud," Kossoff was, ultimately, unable to answer the question, "where did that $100 million go?"

168.     Kossoff did, however, shed light on the Conversion Agreement and its purpose.   According to Kossoff, "beginning in 2011, a cash deficit arose between the [TSE] and [Corporate Resource] on account of [Corporate Resources]'s unpaid invoices.   By the end of January 2015, that cash deficit was approximately $63 million.   Those are funds that the Debtor did not have available to it to make timely payroll tax payments."   Among those funds, Kossoff

acknowledged that there were payroll tax arrears that arose at least as early as 2012 when Corporate Resource and TSE fell behind in payroll tax payments and striked a deal with the IRS to repay them.  TSE held its Corporate Resource common stock until May 21, 2013, when apparent—although suspicious—tax consequences caused TSE to transfer the shares to another R. Cassera affiliated company, one of the TSE Entities.

169.   Again, according to Kossoff, in November, 2013, Corporate Resource common stock "was trading at $3.87 a share, making the more than 30 million shares transferred to TSE[] worth approximately $117,929,256.  TSES intended to borrow against and/or to sell shares in 2014 and use the proceeds to pay all the Debtor's outstanding back payroll taxes."  Of course, given the factors that had caused the stock to trade below market value in 2012, in particular, the illiquidity and the overwhelming control of R. Cassera, the ability of the TSE entities to sell or leverage as collateral such large a block of common stock would have been extremely limited— if it could have sold a material portion thereof at all.  Corporate Resource changed auditors, causing a delay in the filing of the Company's 2013 financial statements.  "As a result," according to Kossoff, "TSES did not sell the [Corporate Resource] stock and repay the [TSE]'s back payroll tax liabilities of $67 million, so that liability was transferred back to the [TSE]'s books and records in late 2014."  Where the many millions of dollars that Corporate Resource received and should have remitted as payroll taxes is still anyone's guess, but Corporate Resource never informed investors that it was missing and that it had a material effect on its financial statement and, ultimately, its very operations.

170.   Thus, Corporate Resources and the R. Cassera-controlled TSE entities, throughout the Class Period, had schemed to use Corporate Resource common stock to avoid paying payroll taxes.  It implemented this scheme without disclosing it to investors.  During the Class Period,

investors were unaware of both the payroll tax deficit and that the means by which Corporate Resource proposed to pay it were unavailable.

171.    On July 1, 2014, Corporate Resource filed the 2013 10-K.  Corporate Resource provided the Company's year-end financial results and position that was disclosed to have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP") and the rules of the SEC.  Included in the Company's year-end financial results and position was the total amount charged by TSE for the Fiscal Years 2013 and 2012 of approximately $717.2 million and $596.2 million, respectively.  The 2013 10-K was signed by Messina, Golde, J. Cassera, R. Cassera, Altucher, Foley, Amato, Clarke, and Melby.  The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Messina and Golde attesting to the accuracy of the financial condition and results of operations of the Company.

172.    Corporate Resource disclosed in the 2013 10-K the Company's focus on government regulations:

**Governmental Regulation**

Staffing firms are generally subject to one or more of the following types of government regulations: (i) regulation of the employer/employee relationship between a firm and its flexible staff, (ii) registration, licensing, record keeping and reporting requirements, and (iii) substantive limitations on its operations. Staffing firms are the legal employers of their temporary workers. Therefore, staffing firms like us are governed by laws regulating the employer/employee relationship, such as labor laws, wage and hour regulations, tax withholding and reporting, social security or retirement, anti-discrimination and workers' compensation. ***We do not anticipate that these legal structures and requirements will have a material effect on our growth or prospects.***

173.    The statements referenced in ¶¶171-172 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual

Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

174.    Corporate Resource disclosed in the 2013 10-K that the Company had sufficient cash flows and working capital, stating, in pertinent part, as follows:

*Cash Flows*

\*       \*       \*

We believe that improving cash flows from operating activities through improved profitability, the refinancing of our asset-based credit facility and other working capital management will enable us to finance our growth through acquisitions or other initiatives. We also believe these sources of cash will be sufficient to fund the monitoring fees contemplated by the extension of our Facility with Wells Fargo, should they be necessary.

\*       \*       \*

*Working Capital*

\*       \*       \*

> Based on the above activities, we believe that we have adequate resources to meet
> our operating needs for the next twelve months.

175.    The statements referenced in ¶174 above were materially false and/or misleading

because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operational, and financial results, which were known to the Individual Defendants or

recklessly disregarded by them.    Specifically, the Individual Defendants made false and/or

misleading statements and/or failed to disclose the following: (1) TSE had material tax-

withholding liability in connection with Corporate Resource's internal employees and employees

placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's

and the Company's survival; and (3) the Company was in default of its crucial financing from

Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of

financing.

176.    Corporate Resource disclosed in the 2013 10-K the nature of its related-party

transacting with TSE, stating, in pertinent part, as follows:

> Tri-State, a related party, provides professional employer services to us as part of
> a co-employment arrangement where Tri-State is the employer of record and we
> are the worksite employer. Professional employer services provided by Tri-State
> include payroll services, administration of employee benefits, workers'
> compensation insurance coverage, customer invoicing and accounts receivable
> collection services. ***These arrangements allow us to reduce certain insurance
> risks and costs. Due to the timing and payment of invoices received, the
> aggregate amount payable for accrued wages and related obligations provided
> by Tri-State was $9.4 million and $9.6 million as of January 3, 2014 and
> December 28, 2012, respectively.***

177.    The statements referenced in ¶176 above were materially false and/or misleading

because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operational, and financial results, which were known to the Individual Defendants or

recklessly disregarded by them.    Specifically, the Individual Defendants made false and/or

misleading statements and/or failed to disclose the following: (1) TSE had material tax-

withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were admitted to being unreliable; and (5) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them.

178.    On August 20, 2014, Corporate Resource filed a Form 10-Q for the quarterly period ended April 4, 2014 with the SEC (the "1Q2014 10-Q").  Corporate Resource provided the Company's quarterly financial results and position that was disclosed to have been prepared in accordance with US GAAP and the rules of the SEC.  Included in the Company's 1Q2014 10-Q financial results and position was the total amount charged by TSE for the Fiscal Quarters ended April 4, 2014 and April 5, 2013 of approximately $201.1 million and $186.6 million, respectively.  The 1Q2014 10-Q was signed by Messina and Golde and contained signed SOX certifications by Messina and Golde, attesting to the accuracy of the financial condition and results of operations of the Company.

179.    The statements referenced in ¶178 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees

placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

180.    Corporate Resource disclosed in the 1Q2014 10-Q that the Company had sufficient cash flows and working capital, stating, in pertinent part, as follows:

*Cash Flows*

\*       \*       \*

We believe that improving cash flows from operating activities through improved profitability, the refinancing of our asset-based credit facility and other working capital management will enable us to finance our growth through acquisitions or other initiatives. We also believe these sources of cash will be sufficient to fund the monitoring fees contemplated by the extension of our Facility with Wells Fargo, should they be necessary.

\*       \*       \*

*Working Capital*

\*       \*       \*

Based on the above activities, we believe that we have adequate resources to meet our operating needs for the next twelve months.

181.    The statements referenced in ¶180 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or

recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; and (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing.

182.    Corporate Resource disclosed in the 1Q2014 10-Q that it did not have significant off-balance-sheet risk, stating, in pertinent part, the following:

> The Company has not entered into any transactions with unconsolidated entities whereby the Company has financial guarantees, subordinated retained interests, derivative instruments or other contingent arrangements that expose the Company to material continuing risks, contingent liabilities, or any other obligation under a variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the Company other than those previously disclosed in either this Current Report on Form 10-Q or our Annual Report on Form 10-K filed July 1, 2014.

183.    The statements referenced in ¶182 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; and (4) the Company had insufficient corporate boundaries between it and the TSE

entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them;.

184.    Corporate Resource disclosed in the 1Q2014 10-Q the nature of its related-party transacting with TSE, stating, in pertinent part, as follows:

> Tri-State, a related party, provides professional employer services to us as part of a co-employment arrangement where Tri-State is the employer of record and we are the worksite employer. Professional employer services provided by Tri-State include payroll services, administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services. ***These arrangements allow us to reduce certain insurance risks and costs. Due to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $17.4 million and $9.4 million as of April 4, 2014 and January 3, 2014, respectively.***

185.    The statements referenced in ¶184 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; and (5) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them.

186.    On September 25, 2014, the Company filed a Form 10-Q for the quarterly period ended July 4, 2014 (the "2Q2014 10-Q") with the SEC.  Corporate Resource provided the Company's quarterly financial results and position that was disclosed to have been prepared in accordance with US GAAP and the rules of the SEC.  Included in the Company's 2Q2014 10-Q financial results and position was the total amounts charged by TSE for the three and six months ended July 4, 2014 of $217.2 million and $411.4 million and for the three and six months ended July 5, 2013 of $174.5 million and $346.8 million, respectively.  The 2Q2014 10-Q was signed by Messina and Golde and contained signed SOX certifications by Messina and Golde, attesting to the accuracy of the financial condition and results of operations of the Company.

187.    The statements referenced in ¶¶186 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including

unlawfully transferring at least tens of millions of dollars between them; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

188.    Corporate Resource disclosed in the 2Q2014 10-Q that the Company had sufficient cash flows and working capital, stating, in pertinent part, as follows:

*Cash Flows*

\*      \*      \*

We believe that improving cash flows from operating activities through improved operating profitability, the potential refinancing of our receivables based credit facility and other working capital management will enable us to finance our growth through acquisitions or other initiatives. We also believe these sources of cash will be sufficient to fund the monitoring fees included in the extension of our Facility with Wells Fargo, should we be unable to replace the Facility.

\*      \*      \*

*Working Capital*

\*      \*      \*

Based on the above activities, we believe that we have adequate resources to meet our operating needs for the next twelve months.

189.    The statements referenced in ¶188 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; and (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing.

190.    Corporate Resource disclosed in the 2Q2014 10-Q that it did not have significant off-balance-sheet risk, stating, in pertinent part, the following:

> The Company has not entered into any transactions with unconsolidated entities whereby the Company has financial guarantees, subordinated retained interests, derivative instruments or other contingent arrangements that expose the Company to material continuing risks, contingent liabilities, or any other obligation under a variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the Company other than those previously disclosed in either this Current Report on Form 10-Q or our Annual Report on Form 10-K filed July 1, 2014.

191.    The statements referenced in ¶190 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; and (4) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them;

192.    Corporate Resource disclosed in the 2Q2014 10-Q the nature of its related-party transacting with TSE, stating, in pertinent part, as follows:

> Tri-State, a related party, provides professional employer services to us as part of a co-employment arrangement where Tri-State is the employer of record and we are the worksite employer. Professional employer services provided by Tri-State include payroll services, administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services. ***These arrangements allow us to reduce certain insurance***

*risks and costs. Due to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $16.3 million and $9.4 million as of July 4, 2014 and January 3, 2014, respectively.*

193.     The statements referenced in ¶192 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; and (5) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them.

194.     On November 14, 2014, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, announcing its results for the quarterly period ended October 3, 2014, stating, in pertinent part, as follows:

Revenue for the third quarter of fiscal year 2014, which ended on October 3, 2014, was $260.3 million, an increase of $51.6 million, or 25 percent, compared to the third fiscal quarter in 2013. The increase is primarily attributable to acquisitions made late in 2013 and in the first quarter of 2014 that added $32.1 million in revenues. Excluding the impact of acquisitions, we generated organic revenue growth of approximately $19.5 million, or 38% of the growth in the quarter under consideration.

For the nine months ended October 3, 2014, revenue grew 20 percent to $724.8 million from $602.0 million reported in the first nine months of fiscal 2013. CRS

has generated this growth while pursuing a strategy to eliminate a select number of unprofitable accounts. In addition, our sales force, especially those whose previous firms have left the business, will continue to grow revenue from existing and new customers.

Gross profit for the fiscal third quarter increased by 26 percent to $32.7 million, generating a gross margin of 12.6 percent. This is a slight increase in gross margin compared to the third fiscal quarter of 2013, when gross profit of $26.0 million generated a margin of 12.4%.

*     *     *

Despite an overall increase in expenses of $2.5 million, selling, general and administrative expenses as a percentage of revenues decreased substantially from 9.6% of revenue in the third fiscal quarter last year to 8.6% of revenues for the current quarter. The increase was primarily due to fees incurred with the change in auditors and the review of our previously reported financial statements, which accounted for approximately $1.1 million of the increase. Additional increases were due to costs relating to supporting our revenue growth, including expenses related to acquired operations, which amounted to $3.1 million.

*     *     *

Interest expense paid on the company's asset-backed credit facility for the quarter increased by $2.2 million, or 252%, from $0.9 million in the year earlier period. This increase reflects higher borrowing costs under the Wells Fargo facility, including a $1.1 million charge related to the application of the effective interest rate method of accounting for the monitoring fees to be paid in the future. As we have disclosed previously, we are actively seeking to replace this facility with a new lender as quickly as possible. Interest expense for the nine months increased by $1.8 million, or 51%, to $5.4 million.

Primarily as a result of this increase in interest expense, pre-tax income for the quarter grew by $1.0 million, or 53%, to $2.7 million. For the nine months ended October 3, 2014, pre-tax income was $0.1 million, down from $2.8 million a year ago. With the full utilization of net operating loss carry-forwards, we had a higher effective income tax rate for the quarter, despite having $4.8 million of available net deferred tax assets on which there is a valuation allowance that will be re-assessed at the end of the year. As a result, net income for the third quarter of fiscal 2014 was $2.4 million compared to $1.7 million in the third quarter of fiscal 2013. For the nine months ended October 3, 2014, the Company reported a net loss of $0.3 million compared to income of $2.6 million for the first nine months of fiscal 2013.

Adjusted EBITDA, a non-GAAP measure defined as earnings before interest, taxes, depreciation, amortization of identifiable intangibles, equity-based compensation expense, loss from equity investment, change in fair value of

70

contingent consideration, and, due to their significant non-recurring nature, professional fees, grew 81 percent to $11.9 million compared to $6.6 million in the prior-year quarter. Adjusted EBITDA for the nine months ending October 3, 2014, rose 76 percent to $25.1 million compared to the $14.2 million reported in the first nine months of fiscal 2013.

*     *     *

"With guidance from our auditors, we have adopted some new financial processes which have helped us manage the company more effectively. This contributed to this quarter's 100 basis-point improvement in selling, general and administrative costs," Mr. Messina continued.

195.    The statements referenced in ¶194 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

196.    On November 14, 2014, the Company filed a Form 10-Q for the quarterly period ended October 3, 2014 (the "3Q2014 10-Q") with the SEC.  Corporate Resource provided the

Company's quarterly financial results and position that was disclosed to have been prepared in accordance with US GAAP and the rules of the SEC.  Included in the Company's 3Q2014 10-Q financial results and position was the total amounts charged by TSE for the three and nine months ended October 3, 2014 of $232.1 million and $652.9 million, respectively, and for the three and nine months ended October 4, 2013 of $190.9 million and $561.4 million, respectively. The 3Q2014 10-Q was signed by Messina and Golde and contained signed SOX certifications by Messina and Golde, attesting to the accuracy of the financial condition and results of operations of the Company.

197.    The statements referenced in ¶196 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; (5) the Company was violating government reporting regulations by failing to disclose key details about its placed employees; (6) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them; and (7) as a result of the foregoing, the Company's SEC filings were materially false and misleading at all relevant times.

198.     Corporate Resource disclosed in the 3Q2014 10-Q that the Company had sufficient cash flows and working capital, stating, in pertinent part, as follows:

*Cash Flows*

\*          \*          \*

We believe that improving cash flows from operating activities through improved operating profitability, the refinancing of our asset-based credit facility and other working capital management will enable us to finance our growth through acquisitions or other initiatives. We also believe these sources of cash will be sufficient to fund the monitoring fees contemplated by the extension of our Facility with Wells Fargo, should we be unable to replace the Facility.

\*          \*          \*

*Working Capital*

\*          \*          \*

Based on the above activities, we believe that we have adequate resources to meet our operating needs for the next twelve months.

199.     The statements referenced in ¶198 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; and (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing.

200.     Corporate Resource disclosed in the 3Q2014 10-Q that it did not have significant off-balance-sheet risk, stating, in pertinent part, the following:

The Company has not entered into any other transactions with unconsolidated entities whereby the Company has financial guarantees, subordinated retained interests, derivative instruments or other contingent arrangements that expose the Company to material continuing risks, contingent liabilities or any other obligation under a variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the Company other than those previously disclosed in either this Current Report on Form 10-Q or our Annual Report on Form 10-K filed July 1, 2014.

201.    The statements referenced in ¶200 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; and (4) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them;

202.    Corporate Resource disclosed in the 3Q2014 10-Q the nature of its related-party transacting with TSE, stating, in pertinent part, as follows:

Tri-State, a related party, provides professional employer services to us as part of a co-employment arrangement where Tri-State is the employer of record and we are the worksite employer. Professional employer services provided by Tri-State include payroll services, administration of employee benefits, workers' compensation insurance coverage, customer invoicing and accounts receivable collection services. **These arrangements allow us to reduce certain insurance risks and costs. Due to the timing and payment of invoices received, the aggregate amount payable for accrued wages and related obligations provided by Tri-State was $18.9 million and $9.4 million as of October 3, 2014 and January 3, 2014, respectively. Tri-State has agreed that they will modify the**

*terms of their invoices to us, when and if necessary, for us to meet our cash flow and debt covenant obligations.*

203.    The statements referenced in ¶202 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; (4) the Company's financial statements were unreliable; and (5) the Company had insufficient corporate boundaries between it and the TSE entities that enabled the entities to engage in undisclosed related-party transactions, including unlawfully transferring at least tens of millions of dollars between them.

204.    On November 26, 2014, Corporate Resource filed a Schedule 14A proxy statement with the SEC ("11/26/14 Proxy Statement"),which  stated, in pertinent part, as follows:

> In connection with the Company's audited financial statements for the fiscal year ended January 3, 2014, our Audit Committee, (1) reviewed and discussed the audited financial statements with management, (2) discussed with the independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as amended and as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T, and (3) received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the PCAOB regarding the independent accountants' communications with the audit committee concerning independence and discussed the independent registered public accounting firm's independence with the independent registered public accounting firm[.]

The Audit Committee has considered and determined that the provision of the services other than audit services referenced above is compatible with maintenance of the auditor's independence. Based upon these reviews and discussions, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2014, for filing with the Securities and Exchange Commission.

205.    The statements referenced in ¶204 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing; and (4) the Company's financial statements were unreliable;

206.    On December 9, 2014, Corporate Resource filed the 12/9/14 Form 8-K, which was signed by Messina, disclosing an amendment to the APAs with Wells Fargo.  Pursuant to the amendments, the Company and each of its subsidiaries agreed to do the following: (i) deliver to Wells Fargo, on or before December 19, 2014, a proposal letter to provide debt or equity financing to the Company in an amount no less than, and the proceeds of which to be used to repay in cash in full, all indebtedness, liabilities, and obligations of the Company and its affiliates to Wells Fargo under the APAs and related documents; (ii) deliver to Wells Fargo, on or before January 15, 2015, a commitment letter with respect to the financing proposal; and (iii) repay all amounts owing to Wells Fargo under the APAs on or before January 31, 2015. Violations of the amendments would have effectuated terminations of the APAs.

207.    Corporate Resource disclosed in the exhibit to the 12/9/14 Form 8-K that under the APAs, Corporate Resource and its subsidiaries were bound to cause TS Employment Inc., a TSE affiliate, to deliver the following to Well Fargo: "(a) monthly updated insurance certificates evidencing, and proof of payment for, workers compensation insurance for TSE and Customer, (b) from time to time at the request of WFBC, an Internal Revenue Service form 8821 from and executed by TSE and each other Person that remits payroll taxes on behalf of Customer or TSE, or in respect of payroll or wages related to the staffing services provided by Customer and (c) on a weekly basis, a report of all payroll and payroll tax payments by TSE and such Person(s), together with evidence, reasonably satisfactory to WFBC, of the same. Without limiting the foregoing, Customer will cooperate to provide information on TSE, upon WFBC's request from time to time."

208.    The statements referenced in ¶¶206-207 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; and (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing.

209.    On December 24, 2014, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing a release entitled "Corporate Resource Services

Confirms Compliance with Wells Fargo Account Purchase Agreements," stating, in pertinent part, as follows:

> Corporate Resource Services, Inc. (NASDAQ: CRRS) (the "Company" or, "CRS"), a diversified technology, staffing, recruiting, and consulting services firm, continues to make progress in its refinancing process with investment bank, Carl Marks Advisors. The Company and Carl Marks are currently in discussions with potential new lenders and have received proposal letters which achieved the December 19th, 2014 milestone in its amendment with Wells Fargo Bank, National Association.

> "We are pleased to be moving forward in our financing process and are working closely with our current and prospective lenders," said John P. Messina, Chief Executive Officer of Corporate Resource Services.

210.    The statements referenced in ¶209 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; (2) this material tax-withholding liability jeopardized TSE's and the Company's survival; and (3) the Company was in default of its crucial financing from Wells Fargo because of this material tax-withholding liability, jeopardizing its main source of financing.

211.    On January 21, 2015, Corporate Resource filed a Form 8-K with the SEC, which was signed by Messina, disclosing amendments that the Company and its subsidiaries made to the APAs with Wells Fargo.  The Company disclosed, in pertinent part, as follows:

> In their amendment ( the "Amendment") to their account purchase agreements (each an "Account Purchase Agreement") with Wells Fargo Bank, National Association ("Wells Fargo") dated as of December 3, 2014, Corporate Resource Services, Inc. ("CRS") and each of its subsidiaries, Corporate Resource Development Inc., Diamond Staffing Services, Inc., Insurance Overload Services,

Inc., TS Staffing Services, Inc., Accountabilities, Inc. and Integrated Consulting Group, Inc. (together the "Company"), agreed to (a) deliver to Wells Fargo, on or before December 19, 2014, a proposal letter (the "Proposal Letter") to provide debt or equity financing to the Company in an amount no less than, and the proceeds of which to be used to repay in cash in full, all indebtedness, liabilities and obligations of the Company and its affiliates to Wells Fargo under the Account Purchase Agreements and related documents, (b) deliver to Wells Fargo, on or before January 15, 2015, a commitment letter (the "Commitment Letter") with respect to such financing proposal, and (c) repay all amounts owing to Wells Fargo under the Account Purchase Agreements on or before January 31, 2015. The Company timely delivered the Proposal Letter and continues to work with the issuer of such financing proposal on the financing described therein, but the Company failed to timely deliver the Commitment Letter. In addition, the Company reported to Wells Fargo on January 15, 2015, through submission of a report first due on December 15, 2014, that it was not in compliance with the Tangible Net Worth covenant under the Account Purchase Agreements as of November 30, 2014, and the Company has not yet delivered to Wells Fargo its December 2014 monthly report, due by January 15, 2015. These failures and noncompliances constitute and result in defaults under the Account Purchase Agreements. We are currently in discussions regarding a potential waiver of the failures and noncompliances and to extend the January 31, 2015 repayment deadline.

212.     The statements referenced in ¶211 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose the following: (1) TSE had material tax-withholding liability in connection with Corporate Resource's internal employees and employees placed at the Company's clients; and (2) this material tax-withholding liability jeopardized TSE's and the Company's survival.

**The Truth Emerges**

213.     On January 12, 2015, the Company announced the abrupt resignation of Defendant Golde effective January 12, 2015 for "personal reasons," who would be replaced by Joseph P. Ciavarella.

214.     On this news, shares of the Company fell $0.05 per share or approximately 4% to close at $1.07 per share on relatively heavy trading volume.   The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

215.     On February 3, 2015 later during market trading, Corporate Resource filed the 2/3/15 Form 8-K, disclosing the following, without limitation: (i) as of November 30, 2014, the Company violated the Tangible Net Worth covenants and committed events of default under the APAs with Wells Fargo; (ii) on January 27, 2015, the Company learned that TSE had a material unpaid federal-payroll-tax liability; (iii) on January 28, 2015, Wells Fargo informed the Company that based on concerns that this material unpaid federal-payroll-tax liability would adversely affect TSE and the Company and the Company's previously reported failures to comply with the APA, Wells Fargo would reconsider funding the Company's operations; (iv) the Company's Audit Committee commenced an independent investigation into these matters and retained independent counsel; and (v) on February 2, 2015, TSE filed for bankruptcy.

216.     On this news, shares of the Company fell $0.39 per share over the next two days or approximately 59% from its previous closing price on February 2, 2015 to close at $0.27 per share on February 4, 2015 on relatively heavy trading volume.   The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

217.     On February 6, 2015 after market hours, Corporate Resource filed  the 2/6/15 Form 8-K, disclosing that the Company's financial statements for the year ended January 3, 2014 and the quarters ended April 4, 2014, July 4, 2014, and October 3, 2014 can no longer be relied on due to TSE's material unpaid federal-payroll-tax liability.

218.     Also on that day after market hours, the Company announced the abrupt resignation of R. Cassera effective February 4, 2015.

219.    On this news, shares of the Company fell $0.06 per share or over 18% from its previous closing price to close at $0.27 per share on February 9, 2015 on relatively heavy trading volume.  The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

220.    On February 10, 2015, Corporate Resource disclosed amendments to the APAs between Corporate Resource and its subsidiaries and Wells Fargo, including the parties acknowledging the ongoing events of termination.

221.    Also on February 10, 2015, Corporate Resource filed the 2/10/15 Form 8-K, disclosing the abrupt resignations of Clarke, Holzer, and Melby—the Audit Committee members—effective February 5, 2015.  In each of their resignation letters, Clarke, Holzer, and Melby expressed concerns about the circumstances surrounding TSE's material unpaid federal-payroll-tax liability, its effect on Corporate Resource, its effect on financing from Wells Fargo, and their inability to conduct an independent investigation of these issues.  Particularly noteworthy was each of Clarke, Holzer, and Melby expressing concern about the malfeasance associated with these issues, the relationship between Corporate Resource and TSE, Corporate Resource's obstruction of their efforts, and their inability to protect the minority shareholders' rights.

222.    On this news, shares of the Company fell $0.04 per share or over 14% from its previous closing price to close at $0.23 per share on February 10, 2015 on relatively heavy trading volume.  The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

223.    On February 24, 2015 after market hours, Corporate Resource filed with the SEC

a Form 8-K, which was signed by Messina, disclosing that the Company's securities would be

delisted from NASDAQ.  Corporate Resource disclosed, in pertinent part, as follows:

> On February 23, 2015, Corporate Resource Services, Inc. (the "Company")
> received a letter (the "Letter")  from The NASDAQ Stock Market ("Nasdaq")
> stating that as a result of the Company's failure to comply with Nasdaq Listing
> Rule 5605(c) and Nasdaq's concerns with the Company's ability to comply with
> Nasdaq Listing Rule 5250(c)(1) (collectively, the "Rules"), trading of the
> Company's common stock will be suspended from The NASDAQ Capital Market
> at the opening of business on March 4, 2015 and a Form 25-NSE will be filed
> with the U.S. Securities and Exchange Commission, which will remove the
> Company's securities from listing and registration on Nasdaq.

> Under the Nasdaq Listing Rules, the Company may appeal the Nasdaq staff's
> determination (the "Staff Determination") to a Hearings Panel, which has the
> authority to grant an exception to the Nasdaq Listing Rules for a period not to
> exceed 180 days from the February 23, 2015 Staff Determination. Under the
> Nasdaq Listing Rules, when the Company requests a hearing, it may also request
> a stay of the suspension, pending the hearing.

> The Company has until 4:00 p.m. Eastern Time on March 2, 2015 to request a
> hearing and an extended stay. The Company does not intend to appeal the Staff
> Determination.

224.    On this news, shares of the Company fell $0.06 per share or approximately 25%

from its previous closing price to close at $0.18 per share on March 25, 2015 on relatively heavy

trading volume.  The Individual Defendants continued concealing the fraud, thereby artificially

inflating the Company's share price.

225.    On March 3, 2015 after market hours, Corporate Resource filed the 3/3/15 Form

8-K, which was signed by Messina, disclosing that the Company sold a meaningful portion of its

assets and business, terminated several meaningful customer relationships, closed offices, and

eliminated related selling, general, and administrative expenses.

226.    On this news, shares of the Company fell $0.03 per share or approximately 30%

from its previous closing price to close at $0.07 per share on March 4, 2015 on relatively heavy

trading volume.  The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

227.    On March 12, 2015 after market hours, Corporate Resource filed the 3/12/15 Form 8-K, which was signed by Messina, disclosing that the Company was substantially terminating its operations.

228.    On this news, shares of the Company fell $0.01 per share or approximately 25% from its previous closing price to close at $0.3 per share on March 13, 2015 on relatively heavy trading volume.  The Individual Defendants continued concealing the fraud, thereby artificially inflating the Company's share price.

229.    On March 20, 2015, Corporate Resource disclosed that the Nasdaq Stock Market, LLC ("NASDAQ") decided to remove from listing Corporate Resource common stock, effective at the opening of trading on March 30, 2015.

230.    On this news, shares of the Company fell $0.01 per share or approximately 25% from its previous closing price to close at $0.3 per share on March 20, 2015 on relatively heavy trading volume.

231.    In total, shares of the Company fell $1.09 per share or approximately 97% since opening at $1.12 per share before the initial truth revelation on January 12, 2015 and closing at $.03 per share on March 20, 2015.

232.    Ultimately, Corporate Resource filed the 4/1/15 Form 12b-25, which was signed by Messina, disclosing that it was unable to estimate when—if at all—it would file its annual report for the year ended January 2, 2015 or any future report.  The reasons included, without limitation, TSE's material unpaid federal-payroll-tax liability, Crowe's resignation, Corporate Resource's financial-statement restatements, and the Company's termination of operations.

233.    As a result of Defendants' false and/or misleading statements, shares of Corporate Resource traded at inflated prices during the Class Period.   However, after disclosure of Defendants' false and/or misleading statements, shares of Corporate Resource suffered a precipitous decline in the market value, thereby causing significant losses and damages to Plaintiffs and other Class members.

## NO SAFE HARBOR

234.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Corporate Resource who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

235.    The market for Corporate Resource shares was open, well-developed, and efficient at all relevant times.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market, which artificially inflated Corporate Resource shares and operated as a fraud or deceit on Class Period purchasers of Corporate

Resource shares by misrepresenting the material facts detailed herein.  As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Corporate Resource shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Corporate Resource shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

236.    During the Class Period, Defendants presented a misleading picture of Corporate Resource's financial condition, revenues, growth, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Corporate Resource shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

237.    In response to the truth revelations, the price of Corporate Resource shares dropped dramatically on high volume, as detailed herein.  These drops, among others, removed inflation from the price of Corporate Resource shares, causing real economic loss to investors who had purchased Corporate Resource shares during the Class Period.

238.    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Corporate Resource shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

239.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Corporate Resource's

share price and the subsequent significant decline in the value of Corporate Resource shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## RELIANCE PRESUMPTION

240.    At all relevant times, the market for Corporate Resource shares was efficient for the following reasons, among others:

a.    For most of the Class Period, Corporate Resource met the requirements for listing, was listed, and actively traded on the NASDAQ under ticker symbol "CRRS," a highly efficient and automated market;

b.    During the Class Period, numerous shares of Corporate Resource stock were traded on a daily basis, demonstrating an active and broad market for Corporate Resource stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, Corporate Resource filed periodic public reports with the SEC;

(d)    Corporate Resource regularly communicated with public investors through established market-communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Corporate Resource was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)    Unexpected material news about Corporate Resource was rapidly reflected and incorporated into Corporate Resource's stock price during the Class Period.

241.    As a result of the foregoing, the market for Corporate Resource shares promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Corporate Resource shares during the Class Period suffered similar injury through their purchase of Corporate Resource shares at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

242.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Corporate Resource securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

243.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Corporate Resource securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Corporate Resource or its transfer agent

and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

244.    Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

245.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

246.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are the following, without limitation:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Corporate Resource;

- whether the Individual Defendants caused Corporate Resource to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Corporate Resource securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

247.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

248.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Corporate Resource securities were traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and Class members purchased, acquired, and/or sold Corporate Resource securities between the time that the Defendants failed to disclose or misrepresent material facts and the time that the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

249.    Based upon the foregoing, Plaintiffs and the Class members are entitled to a presumption of reliance upon the integrity of the market.

250.    Alternatively, Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against the Individual Defendants**

251.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

252.     This Count is asserted against the Individual Defendants and is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

253.     During the Class Period, the Individual Defendants did the following: engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to and, throughout the Class Period, did the following: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Corporate Resource securities; and (iii) cause Plaintiffs and the other Class members to purchase or otherwise acquire Corporate Resource securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

254.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were

designed to influence the market for Corporate Resource securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Corporate Resource's finances and business prospects.

255.    By virtue of their positions at Corporate Resource, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other Class members or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants. Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

256.    The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Corporate Resource securities from their personal portfolios.

257.    Information showing that the Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Individual Defendants' knowledge and control.   As the senior managers and/or directors of Corporate Resource, the Individual Defendants had knowledge of the details of Corporate Resource's internal affairs.

258.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Corporate Resource.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Corporate Resource's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Corporate Resource securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Corporate Resource's business and financial condition that were concealed by the Individual Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Corporate Resource securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and they were damaged upon the revelation of the truth.

259.     During the Class Period, Corporate Resource securities were traded on an active and efficient market.  Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein that the Individual Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Corporate Resource securities at prices artificially inflated by the Individual Defendants' wrongful conduct.  Had Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Corporate Resource securities was substantially lower than the prices paid by Plaintiffs and the other Class members. The market price of Corporate Resource securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and the Class members.

260.     By reason of the conduct alleged herein, the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants

262.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

263.     During the Class Period, the Individual Defendants participated in the operation and management of Corporate Resource, and they conducted and participated, directly and indirectly, in the conduct of Corporate Resource's business affairs.   Because of their senior positions, they knew the adverse non-public information about Corporate Resource's false financial statements.

264.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Corporate Resource's financial condition and results of operations and to correct promptly any public statements issued by Corporate Resource that had become materially false or misleading.

265.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases, and public filings that Corporate Resource disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Corporate Resource to engage in the wrongful acts complained of herein. Each of the Individual Defendants therefore were "controlling persons" of Corporate Resource within the meaning of Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)).  In this capacity, each of them participated in the unlawful conduct alleged that artificially inflated the market price of Corporate Resource securities.

266.    Each of the Individual Defendants, therefore, acted as a controlling person of Corporate Resource.  By reason of their senior management positions and/or being directors of Corporate Resource, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Corporate Resource to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Corporate Resource and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other Class members complain.

267.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Corporate Resource Services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as the Class representatives and their choice of counsel, lead counsel, as Class counsel;

B.    Requiring the Individual Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 13, 2015                    Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Justin Solomon Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
           jnematzadeh@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

Laurence Rosen
Jacob A. Goldberg
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY  10016
Tel: 212-686-1060
Email:  lrosen@rosenlegal.com
           jgoldberg@rosenlegal.com

*Counsel for Lead Plaintiffs*