UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                :

STEPHEN CALFO and JANEZ DEMSAR, et al., :

                        Plaintiffs, :

                                 :

        -against-              :

                                 :

JOHN P MESSINA, Sr., et al.,         :

                    Defendants, :

                                 :

                               :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __07/05/2016__

15 Civ. 4010 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

       Purchasers of Corporate Resource Services, Inc. ("CRS" or the "Company") securities bring this putative class action against certain CRS officers and directors, seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act") for the period April 26, 2012, to March 20, 2015 (the "Class Period"). The Complaint alleges violations of § 10b, Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act. Defendants move to dismiss the Amended Complaint[1] (the "Complaint") pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. For the reasons below, the motion to dismiss is granted in part and denied in part.

## I.    BACKGROUND

       The following facts are taken from the Complaint, documents integral to the Complaint and documents of which a court may take judicial notice. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011). They are presumed to be true for purposes of this motion.

---

[1] Defendants James Foley, Michael J. Golde, John P. Messina, Sr., Jay H. Schecter, and Scott Schecter, move individually; Defendants Joseph Cassera and Robert Cassera, move jointly; and Defendants James Altucher, Karen Amato, Thomas J. Clarke Jr., Larry Melby, and Sylvan Holzer (together, the "Outside Directors"), move jointly. On February 23, 2016, Defendant Holzer was dismissed from this case.

A.     **Undisclosed Tax Withholding Liability**

1.     **CRS and TSE**

The crux of Plaintiffs' allegations is that CRS, through its officers and directors, failed to disclose that TS Employment, Inc. ("TSE"), a company that provided professional employment organization ("PEO") services to CRS, had a $100 million material tax withholding liability involving CRS employees.  CRS and TSE had an intertwined relationship and were under the common control of Defendant Robert Cassera ("R. Cassera").

CRS was a diversified technology, staffing, recruiting and consulting services firm whose stock was publicly traded on the NASDAQ.  As of June 2013, CRS had over 39,000 employees, 6,000 customers, and 815 staffing professionals working throughout the U.S.  R. Cassera was a Board member and majority shareholder of CRS.

TSE was a privately held company.  R. Cassera was the founder and sole owner of TSE and its related entities (the "TSE entities").  Several of R. Cassera's family members worked at the TSE entities' headquarters, and some senior executives at CRS also held positions or had offices at TSE.  TSE's corporate headquarters was located two floors above CRS's New York Office.  CRS and TSE maintained records on the same servers and shared an information technology department.

On August 27, 2010, CRS entered into Master Service Agreements ("MSAs") with TSE and one of its affiliates, TSE-PEO, Inc.  The MSAs created a co-employment arrangement where TSE was the employer of record and CRS was the worksite employer.  Pursuant to the MSAs, CRS outsourced it payroll, tax, and workers' compensation insurance services to TSE and TSE-PEO.  These services included accounting for and paying federal withholding taxes on behalf of up to 30,000 employees placed at CRS internally and employees placed at CRS's clients.  In exchange for its services, TSE and TSE-PEO charged CRS an amount equal to the actual wages

and associated payroll taxes for employees, plus an agreed upon rate for workers' compensation and health insurance, and an administrative fee.  For example, in 2012, the TSE entities charged CRS $596.2 million, and in 2013, $712.2 million, for PEO services.

### 2.      TSE's Responsibility for CRS Payroll Taxes

The Complaint describes how TSE managed the payment of CRS's payroll taxes, based on specific statements of former TSE employees identified by their position and tenure at TSE. TSE's payroll department processed payroll checks for CRS's internal and placed employees, and calculated the amount of federal payroll tax due.  TSE inputted each employee's hours into TSE's internal Apex software system.  Using the software system, TSE's payroll department prepared paychecks for the employees and determined how much to withhold for federal taxes from paychecks.  When the paychecks were printed and sent to employees, the federal taxes were withheld.  TSE's New York headquarters was responsible for accessing the payroll software system to see the amount of federal taxes withheld and, after completing the processing of the paychecks, paying the taxes to the IRS.

For employees that CRS placed with clients, the clients paid TSE weekly for the total hours that placed employees worked, plus a "mark-up" fee of about 35%, intended to cover the placed employees' payroll taxes, workers' compensation, social security, unemployment, and TSE overhead fees.  Similarly, for CRS internal employees, CRS paid TSE for employee payroll, state and federal taxes, and fees.  TSE called CRS daily to report how much cash CRS needed to transfer for tax liabilities.

Each week, payroll managers submitted email reports generated by TSE's database to Maria Ursino, vice president of payroll at the TSE entities and R. Cassera's sister.  The reports totaled gross margins from each PEO client and tallied all federal, state, and local taxes due for that client.  Senior TSE executives could run reports on taxes owed at any given time using the Apex software system, and these reports showed the payroll tax liability as it grew.  The TSE

accounting department in New York was co-led by Yolanda Caserra-Trippiedi, R. Cassera's sister.

### 3.     CRS and the Payroll Tax Liability

CRS maintained its own separate payroll department, which was responsible for ensuring that the money paid to TSE to cover taxes and payroll was accurate.  Both CRS and TSE had access to the computer system that allowed for an automated process to submit time sheets for placed employees.  Monthly reports were generated from mass imports of payroll data from CRS's staffing-agency subsidiaries, and included hours worked by temporary and permanent employees, hourly rates, and city, state and federal tax liabilities.  These reports were ultimately passed up to CRS's CFO, Michael Golde.

Beginning in 2011, CRS was in debt to TSE for back payroll that the TSE entities covered while CRS was expanding.  In 2012, TSE and CRS entered into two "conversion agreements" whereby CRS repaid $14.1 million of indebtedness to TSE with CRS stock. Because TSE accepted stock rather than cash from CRS, TSE did not have the funds available to make timely payroll tax payments to the IRS and fell behind in those payments as early as 2012. In November 2013, CRS's common stock was trading at $3.87 a share, making the over 30 million shares that TSE theoretically held worth approximately $118 million.  TSE intended to borrow against and/or sell the shares in 2014 and use the proceeds to pay all of the outstanding back payroll taxes of $67 million outstanding in late 2014.  However, TSE was unable to borrow against or sell the CRS stock.

In late 2013, CRS dismissed its former auditors and retained a new independent registered public accounting firm, Crowe Horwath LLP ("Crowe"), to audit its financial statements.  Crowe conducted a more detailed audit of CRS than the previous auditors had done, and began reviewing the TSE entities' files because of its financial relationship with CRS.

During this audit, Crowe discovered tax liabilities at TSE for unpaid payroll taxes.  CRS ultimately decided it did not have to disclose the liability on its financial statements.

### 4.     Wells Fargo

Wells Fargo Capital Finance ("Wells Fargo") provided up to $80 million in financing to CRS secured by accounts receivable through account purchase agreements ("APAs"), which was the Company's main source of external financing.  R. Cassera personally guaranteed CRS's obligations to Wells Fargo.  While the loans from TSE to CRS were generally due on demand, on June 20, 2014, Wells Fargo required that TSE not demand payment from CRS of an outstanding balance of at least $15 million for a period of at least one year.  On December 9, 2014, CRS disclosed in a form 8-K certain amendments to its APAs with Wells Fargo, including requirements that TSE deliver to Wells Fargo (a) IRS forms authorizing the disclosure of information relating to payroll taxes or payroll, and (b) weekly reports and evidence of all payroll and payroll tax payments by TSE.

The withholding tax liability violated the APAs and, had Wells Fargo been aware of the extent of the liability, it would have placed more restrictions on CRS or cancelled its credit line altogether.  An event of default under the APAs or acceleration of the indebtedness to Wells Fargo would have had a material adverse effect on CRS.

### 5.     The Demise of CRS

On January 12, 2015, CRS CFO Defendant Golde resigned for "personal reasons."  Upon his resignation the CRS stock price dropped 4%.  On February 2, 2015, TSE filed for bankruptcy in order to "stabilize its business operations" in light of its "recent discovery" that it had failed to pay the IRS as much as $100 million in payroll taxes.  On February 3, 2015, CRS filed a form 8-K, disclosing among other things that (i) on January 27, 2015, CRS had learned of TSE's tax liability; (ii) on January 28, 2015, Wells Fargo had told CRS that, in part because of concerns that the liability would adversely affect TSE and CRS, Wells Fargo would reconsider whether it

would fund CRS's operations; and (iii) TSE had filed for bankruptcy.  Over the next two days, CRS's share price fell approximately 59%.

On February 6, 2015, CRS disclosed in a form 8-K that its financial statements for 2013 and the first three quarters of 2014 could no longer be relied upon due to TSE's material unpaid federal payroll tax liability.  The same day, CRS announced R. Cassera's resignation.  CRS's share price fell 18%.

On February 10, 2015, CRS filed a form 8-K announcing the resignations of Audit Committee members Clarke, Holzer, and Melby.  Each resignation letter expressed concern about the effect of TSE's tax liability on CRS, the malfeasance associated with this issue, and its effect on financing from Wells Fargo.  The same day CRS stock fell 14%.

On February 24, 2015, CRS disclosed after market hours that it had received a letter from the NASDAQ stating that the stock would soon be delisted.  On March 3, 2015, CRS disclosed that it had sold a meaningful portion of its assets and businesses and on March 12, 2015, CRS disclosed that it was substantially terminating its operations.  On March 20, 2015, CRS's stock was delisted.  In total, the share price of the Company fell approximately 97% between January 12, 2015, and March 20, 2015.  CRS declared bankruptcy on July 23, 2015.

### B.      Plaintiffs

Plaintiffs Stephen Calfo and Janez Demsar purchased CRS common stock during the Class Period and allege that they were damaged when the corrective disclosures of the withholding tax liability were made.  As detailed in documents filed with the Court and incorporated by reference in the Complaint, Calfo purchased 59,267 shares of CRS common stock, during the period July 14, 2014 to February 5, 2015 at a collective purchase price of $75,004; and Demsar purchased 9,700 shares of the stock, on July 10, 2014, for $24,049.  Plaintiffs seek to represent a class of those who purchased or otherwise acquired CRS stock during the Class Period and were damaged upon the revelation of the corrective disclosures.

6

### C.    Defendants

#### 1.    Defendant Robert Cassera

When CRS was formed in 2010, R. Cassera owned approximately 66% of its common stock.  R. Cassera was a member of CRS's Board of Directors during the Class Period until his resignation on February 4, 2015.  As of November 21, 2014, he owned approximately 79.4% of the outstanding common stock of CRS, and at one point during the Class Period, approximately 90%.  With this level of control, R. Cassera was able to elect all of the Board members, appoint new management, approve actions requiring shareholder approval, and sell or dispose of assets. R. Cassera personally guaranteed the Wells Fargo financing facility to CRS.  R. Cassera and others signed the 2012 and 2013 forms 10-K, which the Complaint alleges contained misrepresentations and omissions.

R. Cassera was the founder, sole owner, president, and director of TSE since 1993, although he took "no payroll" from TSE.  R. Cassera approved all payments made by TSE and its entities.  R. Cassera employed family members at TSE, including his sisters Yolanda Cassera-Trippiedi and Maria Ursino.  Cassera-Trippiedi was an officer of TSE as its corporate secretary and led its accounting department.  She was also on the board of directors of a CRS subsidiary. Ursino was a vice-president of payroll at TSE and reported directly to R. Cassera.

R. Cassera accomplished CRS's expansion in part through related party transactions between CRS and TSE.  CRS purchased several TSE entities with CRS common stock paid to TSE and R. Cassera.  For example, Diamond Staffing Services Inc. was previously a TSE affiliate; CRS acquired it from R. Cassera on January 31, 2011, for approximately $25 million by issuing 29,411,765 shares of CRS common stock.

The Complaint alleges that R. Cassera, "with full knowledge of the tax and workers' compensation obligations that the TSE entities and CRS were responsible for," caused CRS to transfer over 30 million shares of its common stock to TSE, referring to the two 2012 conversion

agreements between CRS and TSE.  One former employee who was a payroll specialist at TSE's New York headquarters from April 2005 to April 2015 ("FE8") explained that each week, payroll managers submitted email reports generated by TSE's database to Ursino.  The reports totaled gross margins from each PEO client and tallied all federal, state, and local taxes due for that client.  FE8 stated that R. Cassera and Messina were aware of the material tax withholding liability.  Another former employee ("FE3") explained that the issue of whether to disclose the tax liability delayed the filing of the 2013 financial statements, and therefore would have been discussed with the most senior CRS management, including R. Cassera.  FE3 also said that R. Cassera and other senior CRS executives ultimately decided that CRS did not have to disclose the liability, but were "initially on the fence about reporting it."

### 2. Other Defendants Connected to CRS and TSE -- Messina, J. Cassera and Foley

**John P. Messina** was CRS's chairman and chief executive officer during the Class Period.  He served as CRS's president from March 2009 to July 22, 2014.  He has served as TSE's executive vice president since January 1998.  Messina's office was located in TSE's headquarters and he spent considerable time there.  He used the CRS offices only for occasional meetings.  One former employee characterized Messina as a "joint employee" of CRS and TSE and said the companies did not operate like separate businesses.

Messina's approval was required for most CRS payments.  Every day, a controller for TSE called CRS to advise how much cash CRS needed to transfer to TSE to cover tax liabilities; this transfer amount required Messina's approval.  FE8 stated that Messina was aware of the material tax withholding liability.  In 2014, the CFO discussed with Messina whether CRS needed to disclose the tax liability in its 2013 financial statements.  CRS ultimately decided that it did not have to.

Messina signed many of CRS's publically filed documents that allegedly were materially misleading, including the 2012 10-K; the 2013 10-Qs and 10-K; and the 2014 10-Qs.  He also signed the 8-Ks filed on November 14, 2014; December 9, 2014; December 24, 2014; January 21, 2015; February 24, 2015; March 3, 2015; and March 12, 2015.

**Joseph Cassera** is R. Cassera's brother.  During the Class Period he was both a director of CRS and vice president of operations of TSE.  A former TSE staff accountant and payroll manager said that J. Cassera received paychecks from both companies, and that there was "never a clear understanding of where the lines were drawn between the companies."  According to the CRS 2013 10-K, J. Cassera and the other CRS Board members had "responsibility for risk oversight."  J. Cassera signed the 2012 and 2013 10-Ks.

**James Foley** was both a director of CRS and COO of TSE during the Class Period.  According to CRS's 2013 10-K, Foley was a Board member and therefore had "responsibility for risk oversight."  Foley also signed the 2012 and 2013 10-Ks.

### 3.    Defendants with No Official Connection to TSE

**Michael J. Golde** was CRS's CFO during the Class Period until his resignation on January 12, 2015.  Golde spent considerable time in TSE's corporate headquarters.  Golde received the monthly reports about CRS's staffing-agency subsidiaries that included city, state, and federal tax liabilities.

In early to mid-2014, Golde and others decided not to disclose the tax withholding liability in CRS's 2013 financial statements.  Golde signed the Company's second quarter 2012 10-Q, the 2012 10-K, the 2013 10-Qs, the 2013 10-K, and the 2014 10-Qs.  According to a former CRS senior accountant, Golde left CRS in the months leading up to TSE's bankruptcy petition because he knew that CRS was not doing well.

**Jay H. Schecter** was CRS's CEO during the Class Period for less than six months until his resignation on October 8, 2012.  When TSE and CRS executed the first conversion

agreement on March 30, 2012, J. Schecter stated, "[t]his debt conversion significantly strengthens CRS's balance sheet and we continue to evaluate other steps to enhance shareholder value." J. Schecter signed the Company's first and second quarter 2012 10-Qs.

**Scott Schecter** was CRS's CEO during the Class Period for less than a month, prior to J. Schecter, until his termination on May 17, 2012. S. Schecter signed the Company's first quarter 2012 10-Q.

### 4.   Outside Director Defendants

Defendants James Altucher, Karen Amato, Thomas Clarke, and Larry Melby (together, the "Outside Director Defendants") were outside directors of CRS during the Class Period until their resignations. Amato was a director from August 8, 2013 to September 28, 2014; Clarke was a director from April 2013 to February 5, 2015; Melby was a director from February 5, 2013 to February 5, 2015; and Altucher was a director from September 13, 2012, until February 10, 2015.

According to the 2013 10-K, the CRS Directors had "responsibility for risk oversight." The Outside Director Defendants all signed the 2013 10-K. The Outside Director Defendants who were also on the audit committee -- Amato, Clarke and Melby -- were responsible for scrutinizing potential conflicts with TSE.

### D.    Alleged Material Misrepresentations and Omissions

The crux of Plaintiffs' claim is CRS's undisclosed $100 million material tax withholding liability. Specifically the Complaint alleges that CRS, through its officers and directors, omitted material information from its SEC public filings during the Class Period when it failed to disclose the tax withholding liability and its implications. The Complaint also alleges that CRS failed to disclose insufficient corporate boundaries with TSE, which enabled CRS to engage in undisclosed related-party transactions, allegedly causing the tax liability and allowing it to go undisclosed. The alleged implications of the tax liability included (i) jeopardizing TSE's and

CRS's survival, (ii) jeopardizing the Wells Fargo credit facility by creating a default; (iii) making the financial statements unreliable; and (iv) violating government reporting regulations. The Complaint lists and describes each allegedly false filing[2] and the failure to disclose, as well as certain related misstatements.

## II.    STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Because the Complaint alleges securities fraud, it must also satisfy the heightened pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b)(1)-(2), and Rule 9(b) of the Federal Rules of Civil Procedure. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 815 F.3d 85, 92 (2d Cir. 2016). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that a plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2).

---

[2] These are the 10-Qs for 2012, 2013 and 2014; the 10-Ks for 2012 and 2013; and the 8-Ks filed on April 26, 2012; November 14, 2014; December 9, 2014; December 24, 2014; January 21, 2015; February 3, 2015; February 6, 2015; February 10, 2015; February 24, 2015; March 3, 2015; March 12, 2015.

## III.    DISCUSSION

To allege a violation of § 10(b) and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys.*, 818 F.3d at 93 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)).  For the reasons stated below, the Complaint sufficiently alleges violations of § 10(b) and Rule 10b-5 by Defendants R. Cassera, Messina and Golde.  It does not allege such claims against the remaining Defendants because it does not sufficiently plead that they acted with scienter.

### A.    Material Misrepresentations and Omissions

#### 1.    Applicable Law

Federal securities law "do[es] not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (ellipses in original) (quoting 17 C.F.R. § 240.10b–5(b)).

A statement or omission is materially misleading when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market.  *Id.* at 38 (internal quotations omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Application of the total mix standard does not mean that companies must disclose all reports of adverse events; "[t]he question remains whether a *reasonable* investor would have viewed the nondisclosed information as having *significantly* altered the total mix of information made available."  *Id.* at 43-44 (emphases in original) (internal quotations omitted) (quoting *Basic Inc.*, 485 U.S. at 232).

12

## 2. Application

The Complaint alleges a material omission, namely TSE's tax liability. The underlying premise of the Complaint, although it is implied and not explicitly alleged, is that CRS is ultimately liable for TSE's tax withholding liability to the IRS regarding CRS employees. That premise is assumed to be true for purposes of this motion, based on the Complaint's allegations of the rapid demise of both companies after the public disclosure of the liability.

The failure to disclose the tax liability in CRS's SEC filings, including its financial statements, is an actionable omission because a "reasonable investor" would have viewed the liability as having "significantly altered the total mix of information made available" to the market. *See id.* at 38 (internal quotations omitted) (quoting *Basic Inc.*, 485 U.S. at 231-32). The Complaint alleges that the tax liability began to accrue as early as 2012; that by 2014 it had reached $67 million; and that by the end of the Class Period it had reached approximately $100 million. Disclosure of this significant a liability was required because it was necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *See id.* at 44 (ellipses in original) (quoting 17 C.F.R. § 240.10b–5(b)).

The omission is material because of its implications for the Company's financial statements and the Wells Fargo financing, which are detailed in the Complaint. Disclosure of a $100 million (or even a $60 million) liability would have painted a very different picture of CRS's financial condition. For example, CRS listed assets of $143 million and liabilities of $116 million for the year ended January 3, 2014, filed with its 2013 10-K; and listed assets of $184 million and liabilities of $154 million as of October 3, 2014, as filed with its 2014 3rd quarter 10-Q. After the liability was disclosed, CRS announced that its financial statements for the year 2013 as well as the first three quarters of 2014 could no longer be relied upon. The Complaint further alleges that the liability jeopardized CRS's main source of financing from Wells Fargo; the liability created an event of default under the APAs, and Wells Fargo, had it

13

known of the extent of the liability, could have accelerated the date and cancelled the credit line, or imposed severe restrictions on CRS.

**B.      Scienter**

**1.      Applicable Law**

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "This standard requires courts take into account 'plausible opposing inferences.'"  *Id.* at 48 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  An inference of scienter is "strong" only if it is "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  In making this determination, a court must review "all the allegations holistically"; the inquiry cannot be conducted "in a vacuum," but is "inherently comparative . . . a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323-24, 326.  Thus, while the inference of scienter "need not be irrefutable . . . or even the most plausible of competing inferences," it must be "strong in light of other explanations."  *Id.* at 324 (internal quotation marks omitted).

A complaint satisfies the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99).  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  *Emps.' Ret. Sys. of Gov't of the V. I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015)

14

(quoting *ECA*, 553 F.3d at 199).  "[M]otives possessed by virtually all corporate insiders, including . . . the appearance of corporate profitability, or of the success of an investment, . . . the desire to maintain a high stock price in order to increase executive compensation, . . . or prolong the benefits of holding corporate office" are not sufficient to support an inference of scienter. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (internal citations omitted).  Instead, plaintiffs must allege that "defendants benefitted in some concrete and personal way from the purported fraud."  *Id*. at 307-08.

When plaintiffs rely on confidential sources to allege defendants' knowledge, the sources do not need to be named but must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.  Additionally, "confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (citing *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (affirming district court's discounting of confidential source allegations because though the source confirmed that the defendants could obtain access to company information, he "had no knowledge of whether [individual defendants] actually accessed or reviewed the [non-public] reports" and further disclaimed the allegation attributed to him in the complaint)).

## 2.   Application

### 1.  Defendants with Scienter

The Complaint sufficiently pleads scienter as to Defendants R. Cassera, Messina and Golde.  The Complaint's allegations, if true, offer strong circumstantial evidence that all three of these defendants consciously and/or recklessly omitted TSE's tax liability from CRS's public

disclosure documents.  The allegations also support the conclusion that R. Cassera had both the motive and opportunity to prevent the disclosure of the tax liability sufficient to give rise to an inference of scienter.

**R. Cassera**.  The Complaint alleges "strong circumstantial evidence of conscious misbehavior or recklessness" on the part of Defendant R. Cassera.  *See Stratte-McClure*, 776 F.3d at 106.  The allegations, if true, show that R. Cassera knew about TSE's material tax liability and failed to disclose it when necessary to make statements by CRS not misleading.  R. Cassera held critical positions at both CRS and TSE during the Class Period, as a controlling shareholder and a board member at CRS, and as the founder, sole owner and president of TSE. He appointed his siblings to important positions in TSE's accounting and payroll departments. He caused CRS and TSE to engage in significant related party transactions, including the transfer of CRS stock to TSE twice in 2012, which TSE was supposed to sell and use the proceeds to satisfy the then outstanding withholding tax liability to the IRS.  R. Cassera must also have been aware that TSE was unable to sell the CRS stock as planned and therefore that TSE was unable to pay down the tax liability.

The Complaint contains these and further allegations based on information from former employees at CRS and TSE who are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *See Novak*, 216 F.3d at 314.  FE4, a staff accountant and payroll manager at TSE throughout the Class Period, said that all payments by the TSE entities were approved by R. Cassera.  FE8, a payroll specialist at the TSE entities' New York headquarters during the entire Class Period, stated that R. Cassera was aware of the tax liability.  FE3, an accounting manager at CRS's headquarters in New York from before the Class Period to June 2014, stated that R. Cassera and other senior CRS executives ultimately decided that CRS did not have to disclose the liability, but were "initially on the fence about reporting it."  R. Cassera was among those

who signed the 2012 and 2013 forms 10-K, which contained the CRS financial statements that are alleged to have been misleading because they failed to disclose the tax liability.

These circumstances taken together are enough to allege that R. Cassera "knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known [he was] misrepresenting material facts." *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308).

The Complaint also alleges that R. Cassera had a motive to hide the tax liability because of his personal guarantee of the Wells Fargo credit facility, which was CRS's principal financing facility. R. Cassera benefitted in a "concrete and personal way" from the non-disclosure of TSE's tax liability, which would have jeopardized the credit facility and his personal guarantee of more than $60 million. *See Novak*, 216 F.3d at 307-08. "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *see also Frederick v. Mechel OAO*, 475 F. App'x 353, 355-56 (2d Cir. 2012) ("[I]n some circumstances a corporate officer who has pledged personal assets as collateral for the debts of the corporation may have a cognizable motive to commit fraud."). R. Cassera's argument that as a majority shareholder, he "lost a fortune," and thus was not motivated to defraud the Company, is misplaced. As a majority shareholder who also pledged personal assets, he would be motivated to hide facts that would cause the stock price to plummet and would force him to pay on the personal guarantee. *See Tellabs*, 551 U.S. at 325.

R. Cassera offers an alternative explanation for the failure to disclose the tax liability until February 2, 2015 -- that once Crowe, the newly retained auditors for the 2013 audit "uncovered" the tax liability, CRS investigated the fraud until it became apparent that the debt could not be promptly repaid, and then publicly disclosed the liability. Given R. Cassera's position at the two companies, the Complaint's claim of malfeasance is at least as compelling as this innocent explanation. *See id.* at 324 (an inference of scienter must be "at least as compelling

as any opposing inference one could draw from the facts alleged."). For all of these reasons, the allegations of scienter as to R. Cassera are sufficient.

**Messina**. The Complaint alleges "strong circumstantial evidence of conscious misbehavior or recklessness" by Defendant Messina, who was CRS's chairman and CEO. *See Stratte-McClure*, 776 F.3d at 106. Messina was a senior officer at both CRS and TSE during the Class Period. He served as CRS's chairman and CEO throughout the Class Period, as well as its President for most of the Class Period. He was an executive vice president of TSE for the entirety of the Class Period. Although he was the most senior officer at CRS, he (along with R. Cassera) maintained his office at TSE's headquarters. The Complaint alleges that Messina approved all payments by CRS to TSE to cover CRS payroll and tax liabilities, based on statements by FE2, a senior accountant at CRS from March 2014 to March 2015, and FE5, an executive vice president of on-site operations at CRS from July 2012 to May 2015. FE8, the TSE payroll specialist, stated that Messina was aware of the tax liability. Messina signed most of CRS's publically filed documents alleged to have been materially misleading because they did not disclose the withholding tax liability.

These circumstances taken together are enough to allege that Messina "knew facts or had access to non-public information contradicting [his] public statements" and therefore "knew or should have known [he was] misrepresenting material facts." *See In re Scholastic Corp.*, 252 F.3d at 76 (citing *Novak*, 216 F.3d at 308).

Messina argues that the former employees' allegations are insufficient because they are not alleged to have communicated directly with Messina, and the allegations refer to indefinite or unspecified periods of time. Direct communications are unnecessary here where the allegation is that Messina approved all significant payments by CRS and specifically the tax withholding payments by CRS to TSE. The former employees as described in the Complaint were in

positions to know that Messina approved the payments.  The Complaint describes the process

that included Messina's approval:

> FE2 said that Nina Kurtis, a controller for the TSE Entities called FE2 each day to
> tell him how much cash needed to be transferred.  This amount would cover tax
> liabilities.  This transfer amount required Messina's approval.  If [CRS] had
> insufficient funds to meet TSE's demand, Sellas would call the bank to obtain a
> higher credit line.  [CRS] transferred millions of dollars a day to TSE to cover
> payroll and taxes that TSE was supposed to pay on [CRS's] behalf.

As to the specificity of the time period allegations, the Complaint alleges that Messina

held senior positions at CRS and TSE throughout the Class Period; that the relevant former

employee informants likewise were employed by CRS or TSE for most or all of the Class Period;

and that Messina approved the tax withholding transfers from CRS to TSE.  Drawing all

inferences in favor of the non-moving party, it is reasonable to conclude that Messina's approval

was required on the tax withholding transfers throughout the Class Period.  The Complaint is not

required to preface every allegation with the mantra "throughout the Class Period."

Messina argues that a far more compelling inference is that he was unaware of the tax

liability until Crowe uncovered it, which the Complaint alleges was in "early-to-mid-2014."

However, given Messina's position at the two companies and his role in the approval process,

the claims against him in the Complaint are at least as compelling as Messina's alternate

scenario.  *See Tellabs*, 551 U.S. at 324 (an inference of scienter must be "at least as compelling

as any opposing inference one could draw from the facts alleged").  Messina's explanation also

does not account for the non-disclosure of the tax liability after Crowe discovered it, beginning

with the 2013 financial statements in the 2013 10-K.  Consequently, the Complaint's allegations

of scienter are sufficient as to Messina.

**Golde**.  The Complaint alleges "strong circumstantial evidence of conscious misbehavior

or recklessness" by Defendant Golde.  He was CRS's CFO throughout the Class Period until his

resignation in January 2015.  He also spent "considerable time in TSE's corporate headquarters."

As CFO he received monthly reports that included CRS's tax liabilities.  According to FE3, a

CRS accounting manager, Golde discussed with Crowe their concerns about TSE's tax liability.

Golde, along with R. Cassera and other senior CRS executives, ultimately decided that CRS did

not have to disclose the liability in the 2013 financial statements.  Golde, as CFO, signed all or

most of the allegedly misleading 10-Ks and 10-Qs issued during the Class Period.  These

allegations are sufficient to plead scienter -- i.e., that Golde knew of the tax withholding liability

and therefore knew that the financial statements attached to the SEC filings were materially

misleading.

Golde argues that (1) he did not trade stock to benefit from the fraud and (2) the former

employees who made allegations did not report directly to him.  The Complaint is not required to

allege that Golde took any action, only that he knew facts suggesting that CRS's public

statements were inaccurate or misleading.  *See ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d

at 311).  As to the former employees' allegations, FE3 as a CRS accounting manager was in a

position to know Golde's involvement with the outside auditors.  The statement is also supported

by common sense as it is highly unlikely that the CFO would not have been privy to discussions

with a new auditor about a significant liability and major disclosure issue.  The allegations in the

Complaint are sufficient to allege scienter as to Golde.

### 2.  Defendants without Scienter

The Complaint does not "state with particularity facts giving rise to a strong inference"

that any of the remaining Defendants acted with scienter as required by the PSLRA.  *See* 15

U.S.C. § 78u-4(b)(2)(A).

The Complaint does not allege that any of the Defendants except R. Cassera had a motive

to hide the withholding tax liability.  Plaintiffs' argument that R. Cassera's motive be imputed to

the other Defendants because they were "beholden to R. Cassera" is misplaced.  Scienter must be

pleaded for each defendant individually.  "In a case involving multiple defendants, plaintiffs

must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) ("The district court should review the Complaint to determine whether it meets our Circuit's pleading requirements for scienter *as to each of the defendants*.") (emphasis added).

Plaintiffs similarly argue that "[f]raudulent intent should be imputed to a company's key officers where, as here, the subject matter of a fraud involves core aspects of the company's operations." However, "courts in this Circuit have held that general allegations regarding a defendant's involvement in the 'core operations' of a business cannot serve as an independent basis for scienter." *In re ShengdaTech, Inc. Sec. Litig.*, No. 11 Civ. 1918, 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014) (collecting cases). Specific allegations against each remaining Defendant are addressed below.

**Foley and J. Cassera**. Plaintiffs argue that because Foley and J. Cassera wore "dual hats" at TSE and CRS during the class period -- Foley serving as COO at TSE and a director at CRS, and J. Cassera serving as a vice president at TSE and director at CRS -- scienter for them is "inescapable." These are the only allegations in the Complaint relevant to scienter, and without more they are insufficient. *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (holding that scienter cannot be inferred on the part of defendants "by virtue of their high ranking positions" within the company); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("the mere fact that the Directors were controlling persons at [the company] does not link them to the statements; the plaintiffs also had to allege that the Directors *personally* knew of, or participated in, the fraud."); *Minnie Rose LLC v. Yu*, No. 15 Civ. 1923, 2016 WL 1049020, at *9 (S.D.N.Y. Mar. 11, 2016) (affirming *Mills*' holding but distinguishing the plaintiffs' case as

adequately alleging the corporate officer personally knew of and participated in the alleged fraud).

**J. Schecter and S. Schecter**.  Plaintiffs do not make any specific allegations of scienter against J. Schecter or S. Schecter.  This may be because their tenures during the Class Period were brief and early:  S. Schecter resigned as CRS's CEO after less than a month during the Class Period on May 17, 2012, and J. Schecter resigned as CRS's CEO after five months during the Class Period on October 8, 2012.  These allegations are insufficient to state a claim against them.

**The Outside Directors -- Altucher, Amato, Clarke and Melby**.  Plaintiffs' allegations of scienter as to the Outside Directors are based on the fact that they served during the Class Period, and therefore must have known about the tax liability and alleged resulting misstatements in the SEC filings.  Plaintiffs argue that "given the firing of [CRS's former independent auditor] RSSM, the hiring of Crowe, the substantial delay in filing the 2013 10-K, and Crowe's discussions with senior executives, most of whom -- R. Cassera, J. Cassera, Messina, and Foley -- were on the Board, it is reasonable to infer that they or the Audit Committee alerted all of the remaining CRS Board members, including Altucher, of the payroll-tax issue."  Without more, this allegation fails to allege scienter as it is less compelling than the alternative theory that the inside directors with knowledge of the extent of the tax liability and its implications for CRS withheld that information from the Outside Directors until R. Cassera and his confidants were prepared to disclose it publicly.  *See Tellabs*, 551 U.S. at 324 (an inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged.").

The Complaint makes no allegations that the Outside Directors knew about the existence or extent of the outstanding tax withholding liability until, at the earliest, just before they resigned.  Amato resigned as director on September 28, 2014, before the fraud came to public light; Clarke and Melby, in their resignation letters dated February 5, 2015, stated that they "first

learned of the unpaid federal payroll tax liability and related problems on January 29, 2015";
Altucher likely learned of the fraud along with the rest of the outside directors (and Plaintiffs do
not allege otherwise) and resigned on February 10, 2015.  "[A]n allegation that a defendant
merely 'ought to have known' is not sufficient to allege recklessness."  *McIntire v. China
MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 129 (S.D.N.Y. 2013) (internal citation
omitted); *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 Civ. 7301,
2007 WL 2615928, at *5 (S.D.N.Y. Sept. 10, 2007) (granting outside directors' motion to
dismiss 10b-5 claims where "Plaintiffs' pleadings . . . amount to asking the Court to infer, from
the fact that the Outside Directors served as outside directors or audit committee members, that
Plaintiffs' burden of pleading scienter satisfies itself automatically.")

Plaintiffs' arguments that the audit committee members (Amato, Clarke and Melby) had
a duty to monitor but failed to do so are also unavailing.  Unlike the compensation committee
members charged with a specific duty to monitor option exercise dates in *In re Openwave
Systems Securities Litigation*, which Plaintiffs cite as support, here the audit committee members
were not charged with any specific duties to monitor CRS's or TSE's tax liabilities.  *See* 528 F.
Supp. 2d 236, 250 (S.D.N.Y. 2007).  Plaintiffs have not "pointed to any specific obligation
imposed on the Audit Committee Defendants that they ignored such that it would be fair to infer
that they either knew of the fraud or must have been aware of it . . . Section 10(b) . . . does not
impose liability for negligence or impose obligations *ex post facto*."  *In re WorldCom, Inc. Sec.
Litig.*, No. 02 Civ. 3288, 2003 WL 23174761, at *5 (S.D.N.Y. Dec. 3, 2003).

Plaintiffs further argue that the remaining Defendants, in particular the audit committee
members, ignored two red flags:  (i) that CRS' internal controls were materially deficient and
(ii) that CRS changed its auditors one week before the end of the 2013 fiscal year.  "[F]lags are
not red merely because the plaintiff calls them red. . . . Plaintiffs must allege that facts which
come to a defendant's attention would place a reasonable party in defendant's position on notice

23

of wrongdoing." *McIntire*, 927 F. Supp. 2d at 131 (internal citations and quotation marks omitted).

As to the first alleged red flag, Plaintiffs assert that in the 2013 10-K, the Defendants were put on notice because material weaknesses in their internal controls resulted in "actual or potential misstatements in many accounts including:  accounts receivable; equity based compensation; equity method intangible assets including goodwill; and provision for income taxes."  However, being put on notice about internal control deficiencies does not on its own rise to the level of being put on notice of fraud.  *See, e.g.*, *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 480 (S.D.N.Y. 2013) (holding that even if audit committee defendants were put on notice of internal control deficiencies, "Plaintiffs offer no facts regarding the specific deficiencies referenced or about how more thorough investigation into these deficiencies would have led the [audit committee] Defendants to discover the fraud"); *In re ShengdaTech*, 2014 WL 3928606, at *8 (finding that knowledge of internal control deficiencies noted in an audit report and 10-Qs did not put the defendants on notice of fraud); *cf. McIntire*, 927 F. Supp. 2d at 131 (finding that the annual report's disclosures regarding potential difficulties in collecting financial data and the management's expectation that "internal controls will [not] prevent all error and all fraud" are "mere warning signs" rather than "smoking guns" constituting red flags).

As to the second alleged red flag, Plaintiffs allege that the change in auditor created three possible inferences:  (1) the audit committee determined that their previous auditor was incompetent, raising red flags that serious problems existed; (2) the previous auditor knew of the material tax liability, raised it with CRS's most senior executives and the Audit Committee, but was prepared to publish its audit opinion without requiring disclosure; or (3) the previous auditor knew about the material tax liability but was unprepared to certify its audit opinion unless CRS remedied the issue or disclosed the liability.  Only the third of these would have put the Outside

Directors on notice of the tax liability and the need to disclose it.  The other two suggestions, as well as many other possible scenarios, would not have done so.  For example, the Complaint alludes to, but does not flesh out, an alleged fraud of misappropriated funds lost in the related party transactions between CRS and TSE.  The former auditors could have raised questions relating to these issues.  A more mundane possibility is that the former auditors could have insisted on CRS recharacterizing or writing off receivables or some other asset that they had allowed to sit on the books for a long time.  The possibilities of why the Company discharged its auditor at an inconvenient time, late in the fiscal year, are numerous.  The inferences Plaintiffs suggest are not more compelling than any opposing inference one could draw from the facts alleged.  *See Tellabs*, 551 U.S. at 324.  Overall, the allegations against the audit committee members "reveal at most an Audit Committee that . . . was anemic in its oversight function.  The allegation that a defendant generally failed to perform a job well, however, is not a substitute for the particularized pleading that a defendant knowingly or recklessly engaged in fraud."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 654 (S.D.N.Y. 2007) (citing *In re WorldCom*, 2003 WL 23174761, at *6).

In sum, having considered the allegations against the remaining Defendants, Plaintiffs have failed to plead sufficient facts to raise a strong inference of recklessness on the part of Defendants Foley, J. Cassera, J. Schecter, S. Schecter and the Outside Directors (Alutcher, Amato, Clarke and Melby).

### C.    Loss Causation

"In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent*

*Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Inv'rs, L.P. v. Toronto– Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added), "*i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  Otherwise, the loss in question was not foreseeable."  *Lentell*, 396 F. 3d at 173.  Loss causation may be established under two possible theories: "either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that . . . 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 232-33 (emphasis omitted) (quoting *In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).  "In order to plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected'" and "that the market reacted negatively to the corrective disclosure."  *Id.* (citing *Lentell*, 396 F.3d at 175).

The Complaint sufficiently alleges loss causation by pleading corrective disclosure -- that on February 3, 2015, CRS disclosed the tax liability and related developments, i.e.,  that the Wells Fargo financing was in jeopardy and that TSE had filed for bankruptcy.  CRS's stock dropped 59% over the next two days.  Three weeks later, on February 24, 2015, the NASDAQ informed CRS that their stock would soon be delisted.  These allegations show the requisite nexus between the alleged omission and Plaintiffs' injuries.

The Cassera Defendants argue that loss causation is lacking because the Complaint allegedly fails to aver when the indebtedness started, how much it was over the years, when it became material, and when Plaintiffs purchased their shares of CRS stock.  Defendants are

mistaken.  The Complaint alleges that TSE fell behind in its payments to the IRS as early as 2012; that by the end of 2014 the liability had grown to $67 million; and that by early 2015 it had grown to as much as $100 million.  The Complaint alleges that Plaintiffs purchased stock during 2014 and 2015, and that the value of the stock plunged upon the disclosures of the liability and related developments in the first quarter of 2015.  These allegations are sufficient to plead loss causation.

### D.      Section 20(a) Claim

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc.*, 493 F.3d at 108.  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.'"  *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  "[A]ctual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."  *Id.* at 764.

If the Complaint does not allege a primary violation, the Complaint must be dismissed. As the primary violation here is dismissed as to Defendants J. Cassera, J. Schecter, S. Schecter, Alutcher, Amato, Clarke, and Melby, the § 20(a) claim against them is dismissed as well.

Since R. Cassera, Messina and Golde acted as controllers, the § 20(a) claims against them may proceed.  According to the Complaint, each of these Defendants held top positions of management, and as described above, culpably participated in hiding CRS's tax withholding liability from public view.

**IV.     CONCLUSION**

      For the foregoing reasons, the motions to dismiss Defendants J. Cassera, J. Schecter, S. Schecter, Alutcher, Amato, Clarke, and Melby are GRANTED.   The motions to dismiss Defendants R. Cassera, Messina, and Golde are DENIED.

      The Clerk of Court is directed to close Docket. Nos. 81, 83, 85, 88, 90, 93, 95, and 109.

SO ORDERED.

DATED:  July 5, 2016
         New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**